## APPEAL OF HENRY FULMER.

### [FULMER v. WILLIAMS.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF LEHIGH COUNTY.

Argued February 7, 1889—Decided October 7, 1889.
[To be reported.]

1. Where one tenant in common in the exclusive possession of lands operates a slate-quarry thereon, though opened and developed, the compensation to which his co-tenant is entitled, under § 24, act of April 25, 1850, P. L. 573, is not to be measured by the value of the slate on the bank, less the cost of mining and putting it there with a margin of profit to the operator;

2. But such compensation is to be measured by the fair market value of the slate in place, which is the royalty or slate-leave to be obtained for the privilege of removing and manufacturing the slate, in view of all its special circumstances: Neel's App., 3 Penny. 66, followed; Coleman's App., 62 Pa. 252, and Ege v. Kille, 84 Pa. 333, distinguished.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and MITCHELL, JJ.

No. 123 July Term 1888, Sup. Ct.; court below, No. 1 April Term 1883, C. P. in Equity.

On February 17, 1883, Henry Fulmer filed a bill in equity against David Williams, charging in substance that the plaintiff and defendant from October 15, 1880, to September 4, 1882, were tenants in common of certain slate quarries, which, however, were being worked exclusively by the defendants;— praying for an account by the defendant, (1) " of the quantity

of slate taken out and removed, the quality and value of them, and also an account of all rents and profits received or made from the exclusive use, occupancy and enjoyment of the premises so held in common;" (2), general relief.

The cause being put at issue by answer and replication, *Mr. John Rupp* was appointed examiner and master, who found the following facts:

David Williams and Henry W. Harper, as David Williams & Co., were carrying on the business of mining and manufacturing slate in an opened and developed quarry upon certain lands near the borough of Slatington, of which David Williams was the owner of an undivided two thirds interest and Henry W. Harper of an undivided one third interest. Upon a judgment against Henry W. Harper, a writ of venditioni exponas was issued and the interest of Harper in the premises upon which the quarries were situated was sold at sheriff's sale to the First National Bank of Easton. By deed dated October 15, 1880, the First National Bank of Easton conveyed the title of the bank to Henry Fulmer, who soon afterward filed a bill in equity against David Williams for a partition of the premises, resulting in a sale of the entire title to Henry Fulmer, who received a deed and took possession of the lands on September 7, 1882.

Other material findings of fact by the master were as follows:

11. During the time that Fulmer and Williams were the joint owners of said premises, from October 15, 1880, to September 4, 1882, there was upon these premises an opened and well developed slate quarry with the beds of slate uncovered and exposed, stripping done and easily worked and producing large quantities of a superior quality of roofing slate, school slate and blackboard and mantel stock; with all the necessary machinery, buildings and appliances for quarrying, mining, hoisting and manufacturing roofing slate, blackboard and mantel stock and school slate, including engine house, engines and boilers, pumps, derricks, hoists, ropes, tools of all kinds, the necessary buildings and machinery for manufacturing blackboards and mantel stock, a marbleizing factory, with all the necessary machinery and appliances, all necessary buildings for storing slate of all kinds manufactured; all in good condition and in good working order, with the Lehigh Valley Rail-

road running close by the quarry, with conveniences for loading and shipping slate. There were also two tenant houses upon the premises.

12. From October 15, 1880, to September 4, 1882, during the time Fulmer and Williams were the joint owners of said premises, the said David Williams had the sole and exclusive possession of the premises, with all the buildings and appliances thereon erected and thereto belonging, worked said slate quarry and took therefrom large quantities of roofing slate, school slate and blackboard and mantel stock, and sold and converted the same to his own use, to the exclusion of his co-tenant, the said Henry Fulmer.

13. After the said Fulmer got possession of the said premises the said Williams failed and neglected to render an account of the slate taken out of said quarry, to the said Fulmer, during the time of their joint ownership of the same, and this bill was then filed for an account.

14. During the period of time that the said Fulmer and the said Williams were the joint owners of said premises, from October 15, 1880, to September 4, 1882, the said David Williams mined and quarried upon said premises and took from said slate quarry upon said premises and sold and converted to his own use, 3,899.18 squares of No. 1 roofing slate and 250.57 squares of No. 2 roofing slate, in all 4,149.75 squares of roofing slate, 1,147,750 school slate in the rough, of the standard measure of 7 by 11 inches, and 26,063 square feet of blackboard and mantel stock in the rough, an inch thick.

15–17. Roofing slate are sold by the square, and a square of roofing slate is a sufficient quantity of slate to cover one hundred square feet of roof. The material for school slate as it comes out of the quarry is split into the proper thickness for school slates without regard to the size of the slabs of slate, without being sawed or dressed. The standard of measurement is 7 by 11 inches in size. A slab that cuts one slate of 7 by 11 and less than two is called one slate, and one that cuts two slates 7 by 11 and less than three is counted two slates, and so on, and in this condition is placed upon the banks of the quarry and sold by the thousand. Mantel and blackboard stock is measured as it comes out of the quarry in the rough without being cut, dressed or sawed, and measured by

the square foot an inch thick, and either sold in that condition from the bank or taken to the factory and manufactured into finished blackboards and mantel stock.

18–20. The average market price of roofing slate ready finished for market, on the banks of this quarry, from October, 1880, to September, 1882, was about $3.25 per square. The average market price of school slate in the rough, on the banks of this quarry, from October, 1880, to September, 1882, was $7 per 1000 of the standard measure of 7 by 11 inches. The average market price of blackboard and mantel stock in the rough on the banks of the quarry from October, 1880, to September, 1882, was 7c. per square foot an inch thick.

21. In the condition this quarry was in from October, 1880, to September, 1882, with the uncovering all done and beds of slate uncovered, with all the machinery, appliances and tools for working the quarry, mining and making slate supplied, and the facilities for working the quarry, the cost of mining, hoisting, splitting, dressing and preparing for market of roofing slate was $2 per square; the cost of mining and splitting school slate was $3 per 1000 slates in the rough of the standard measure of 7 by 11 inches; and the cost of mining and placing on the banks blackboard and mantel stock in the rough was 3c. per square foot measured an inch thick, these amounts including a fair and reasonable profit to the parties operating the quarry or the parties working the quarry by contract. In other words, these are the amounts at which contractors would have operated the quarry during this period of time and placed the different kinds of slate on the banks of the quarry, ready for market, without any expense to the owners of the quarry, and would have made a fair profit for themselves. These figures, however, do not include cost of uncovering and preparing the quarry for working or the cost of machinery, but only the cost of operating the quarry and ordinary repairs of machinery.

22. In the condition this quarry was in from October, 1880, to September, 1882, with uncovering done, the quarry developed, with all the machinery, tools and appliances for working the quarry supplied, with all the necessary buildings erected upon the premises, with the necessary machinery for making the different kinds of slate supplied, the facilities for working

the quarry, its conveniences for loading and shipping slate and its proximity to the railroad during this period of time, the value of the different kinds of slate in the quarry in place was as follows: Roofing slate $1.25 per square, school slate in the rough $4 per 1000 slates of the standard measure of 7 by 11, and mantel and blackboard stock in the rough 4c. per square foot, measured an inch think.

23–27. Some uncovering became necessary for the proper working of the quarry at the western end thereof, during this period. This uncovering was done by H. W. Weiss under a contract, for which he was paid by Williams the sum of $437.50. It became necessary to do some repairing to the boilers and boiler-house. This repair was made by Williams, for which he paid $162.11. Williams paid taxes assessed upon the premises in question, for the time he and Fulmer were the joint owners thereof, amounting to $131.31. Williams received $37 rent for the two tenant houses upon said premises. This was the only rent received by Williams for any of said premises during said period of time. The said Fulmer paid taxes assessed upon said premises, amounting to $84.28.

28. Since the time this quarry in question was first opened and, developed, it has never been leased on royalties.

Upon the foregoing facts, the master's conclusions of law, as shown by his report filed on November 11, 1887, were as follows:

It is unnecessary now to discuss the question whether either at common law or under the statute of 4 Anne, C. 16, § 27, in force in Pennsylvania; Roberts's Digest, *48, one tenant in common of a slate quarry could maintain a bill in equity for an account against his co-tenant, who was in the exclusive possession of the common property, and mined, took and converted to his own use the slate from the common property. This question is put at rest by § 24, act of April 25, 1850, P. L. 573, which is as follows, to wit: "In all cases in which any coal or iron ore mines or minerals shall be held by two or more persons, as tenants in common, and coal, iron ore or other mineral has been or shall be taken from the same, by any one or more of said tenants respectively, it shall be lawful for any one of said tenants in common to apply by bill or petition in equity to the Court of Common Pleas of the county in which the lands

lie, praying that an account may be decreed and taken of all coal, iron ore or other mineral taken by said tenants respectively; and the said court shall thereupon proceed upon such bill or petition agreeably to the course of a Court of Chancery, and shall have full power and authority to make all orders, appointments and decrees, interlocutory and final, that may appertain to justice and equity in the premises, and may cause to be ascertained the quantity and value of the coal, iron ore or other mineral so taken respectively by the respective parties, and the sum that may be justly and equitably due by and from and to them respectively therefor, according to the respective proportions and interests to which they may be respectively entitled in the lands."

In Coleman's App., 62 Pa. 252, this act of assembly was construed by the Supreme Court of this state. It was there held that this act applied to all cases where coal, iron ore or other mineral has been or shall be taken from the common property, by one or more of the tenants in common, without regard to the proportion of the portion taken to the portion remaining in the beds. This act applies to the case in hand, and all the principles and rules of law governing this case are fully and clearly stated in the opinion of Mr. Justice SHARSWOOD. It is true, this act does not mention slate, but it speaks of coal, iron ore or other minerals, and slate is a mineral within the meaning of the act.

The plaintiff and the defendant were tenants in common of the property in question from October 15, 1880, to September 4, 1882, the plaintiff owning the undivided one third interest, and the defendant the undivided two thirds interest.

The defendant was in the exclusive possession of the premises disputed, and denied the plaintiff's interest in the same and mined large quantities of slate and sold them for his exclusive benefit. Upon what basis, then, is the value of the slate taken to be ascertained, so as to arrive at the sum that is justly and equitably due by the defendant to the plaintiff for the slate taken by him?

The defendant in working the quarry was not a trespasser. He had the right to take the common property, and he had no other means of taking his own just share than by taking at the same time the share of his co-tenant. The value of the slate

in place is manifestly what the defendant must account for. That is, the value of the slate in place must be taken as a basis upon which to adjust the accounts between the plaintiff and the defendant: Coleman's Appeal, supra.

But how is the value of the slate in place to be ascertained? The plaintiff contends that this must be done by ascertaining the market value of the slate on the bank of the quarry, and deducting therefrom the cost of mining and putting it there, with a fair and reasonable profit to the operator of the quarry; or, in other words, by deducting from the market price of the slate on the bank the cost at which contractors would mine it and put it there, without expense to the owners of the quarry; and all his evidence was directed to this point.   On the other hand, the defendant contends that the value of the slate in place is the royalty that would be paid by a lessee to the owner of the quarry, based upon the usual rates of royalties paid by lessees to owners of quarries in the Slatington slate region, and all his evidence was directed to this point.   In Coleman's Appeal the former method was adopted and the reasons therefor stated.

In order to arrive at a correct solution of this question we will have to take into consideration the actual condition of this quarry during the time the plaintiff and the defendant were the joint owners thereof.   This is found in the 11th finding of facts.   It is there stated that during this period of time this was an opened and well-developed quarry, with uncovering and stripping done, beds of slate exposed and easily worked, producing large quantities of a superior quality of roofing, school, blackboard and mantel slate, and well supplied with all the buildings, machinery and appliances for mining and manufacturing roofing, school, blackboard and mantel slate, with the Lehigh Valley Railroad running past the quarry, affording facilities for loading and shipping slate.   These buildings, factories, machinery, tools and appliances constituted a part of the joint property of the plaintiff and the defendant, having been erected and supplied by the defendant and H. W. Harper, the plaintiff's predecessor in title, and whose rights he acquired by purchase, at their joint expense.

It would seem to be clear that under these circumstances, at this quarry, in order to ascertain the respective rights of the

parties and the amount justly and equitably due from the one to the other, the value of the slate in place cannot be ascertained by ascertaining what is usually and ordinarily paid as royalty by lessees to owners of quarries in this region. Leases on royalties are generally made for unopened and undeveloped quarries, the lessee bearing the expense of opening and developing the quarry and supplying the machinery and running the risk of the quarry perhaps turning out entirely worthless. It must be obvious that this would not be a fair test of the value of slate in place in the quarry in question. Besides, as shown by the evidence, and as must be the case from the nature of things, quarries in this region differ greatly in value and the quality of material produced. Some produce better slate than others. Some produce roofing slate exclusively, and others roofing, school, blackboard and mantel slate. Some are more easily worked than others, and some are in closer proximity to railroads and have better shipping facilities than others, and as widely as quarries in this region differ from each other, in these respects, so widely do the royalties paid at the different quarries differ as to amounts. Here, when the plaintiff became a joint owner with the defendant, the quarry was uncovered and fully developed and all the machinery and appliances were at hand. It is true, this had been done by the defendant and Harper before the plaintiff acquired his interest therein, but the latter succeeded to the rights of Harper and paid for Harper's interest in the quarry, with machinery, appliances, etc., in the condition it was at the time of his purchase.

During the time in question the expense of working this quarry by the defendant, outside of the wages of the laborers, must in the nature of things have been very small. The capital invested in the development of the quarry and the machinery appliances and equipments were the joint property of the plaintiff and the defendant. The defendant, in working the quarry and placing its product upon the banks of the quarry ready for market, assumed no risk. He had no capital employed in any hazardous enterprise. The only risk of loss he assumed in operating the quarry was that of bad debts in the sale of its product, but with that the plaintiff had nothing to do. If the defendant chose to sell the plaintiff's share of the product of the quarry and thereby lost, that was a risk he voluntarily assumed. He was not bound to do so.

In the opinion of the master the fair and proper way of ascertaining the value of the slate in place in this quarry taken by the defendant, during the time he and the plaintiff were the joint owners thereof, taking all the circumstances into consideration, in order to ascertain the amount justly and equitably due therefor from the one to the other, is by ascertaining the market price of the slate on the bank and deducting therefrom the cost of mining and putting it there, with a margin for a fair and reasonable profit to the operator of the quarry; or, in other words, deducting from the market price of the slate on the bank the amount for which contractors would operate the quarry and put the slate on the bank for the owner, ready for market, without any expense to the latter. This method of ascertaining the value of the slate in place, under the circumstances of this case, is absolutely fair to both parties and does exact justice between them, and accords with the principle enunciated in Coleman's Appeal.

The master has adopted this method for ascertaining the value of the slate in place taken by the defendant during the time he and plaintiff were the joint owners of the quarry, and has fixed the value of roofing slate at $1.25 per square; school slate at $4 per 1,000 in the rough of the standard measure of 7 by 11 inches, and blackboard and mantel slate at 4c. per square foot an inch thick.

It will be evident that by adopting this method of fixing the value of the slate in place taken by the defendant as the basis of stating the account between him and the plaintiff, the defendant will be entitled to a credit for the uncovering he did during this time, to wit, $427.50. It is true, not much slate was taken out of that portion of the quarry during this time where this uncovering was done, yet it was for the benefit of the quarry, and inured to the joint benefit of the owners thereof, and in justice this expense should be credited to the defendant in stating the account so as to make each pay his proper proportion thereof. This will be done by the master. The same is true as to the expense of repairing the boilers and boiler house. This is also a proper item of credit to which the defendant is entitled, and this will also be allowed in the account. The taxes paid on the premises in question by the plaintiff and the defendant, respectively, will also have to be

credited to them respectively in the accounts between them, as they were jointly liable for these taxes in proportion to their respective interests in the property.

\* \* \* \* \* \* \* \*

—After passing upon other questions not material to this report, the master stated an account, wherein he charged the defendant with "the value of the slate in place taken by him" during the time the parties were joint owners of the property, the roofing slate being charged at $1.25 per square; school slates at $4 per 1000; mantel stock at 4 cts. per square foot, and charging also taxes paid by plaintiff, and rent received by defendant, making a total charge of $10,941.98. The defendant was then credited for the cash paid H. W. Weiss, excavating; repairing boiler, and for taxes paid by defendant, aggregating $730.92; making a balance of $10,211.06, of which the one third, $3,403.68, with interest from September 4, 1882, $1,055.14, amounting to $4,458.82, the master awarded to the plaintiff, and reported a decree accordingly.

To this report of the master, both the plaintiff and defendant filed exceptions. Certain of the defendant's exceptions alleged that the master erred:

10. In not giving proper consideration and application to the testimony as to the value of the slate in the quarry, in the shape of slate-leave or royalty.

17. In holding that the measure of the defendant's liability was the value of the product on the surface, less the cost of taking it from the quarry.

18. In not holding that the plaintiff's measure of compensation must be the value of the product in the ground as determined by the ruling market rates of royalties prevailing in that neighborhood.

The exceptions filed to the report being argued, on March 5, 1888, the court, ALBRIGHT, P. J., filed the following opinion:

From October 15, 1880, to September, 1882, plaintiff and defendant owned a slate quarry as tenants in common; plaintiff owned an undivided one third. During this period the defendant, who had been taking slate out of the quarry before plaintiff acquired an interest, continued to work it. What he took out when manufactured or prepared for manufacture

amounted to 4,149.75 squares of roofing slate, 1,147,750 school slates and 26,063 square feet (of the thickness of about one inch) of materials for mantels. In this proceeding the plaintiff seeks to recover his share of the value of said slate. The chief controversy is as to how the value is to be ascertained.

The act of April 25, 1850, P. L. 573, and the cases of Coleman's App., 62 Pa. 252, and Neel's App., 3 Penny. 66, leave no doubt as to the rule. The one taking the valuable product out of the ground shall pay his co-tenant who took none, the latter's share of the value of the mineral in place, the value of the ore leave. No element of damages for injury shall enter into the calculation. The tenant who takes the product out of the mine is taking his own; at the same time, he necessarily removes his co-tenant's share. The value of that share he shall pay. In Coleman's Appeal, Justice SHARSWOOD said that he is to be treated even more favorably than one who mistaking his line had cut logs on an adjoining tract, because there the property was taken wrongfully and against the owner's will. In a case of that kind, Herdic v. Young, 55 Pa. 176, the owner was held to be entitled to the value of the logs in the boom, less the cost of cutting and bringing them to the boom.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

In this case, the plaintiff proved the value of the slate on the bank of the quarry; of the roofing slate, split and dressed, and of the school slate split of the required thickness undressed, and of the mantel and blackboard stock in the rough. Then he introduced evidence to show what it was worth to quarry and place said material there in that condition. The defendant gave evidence tending to show what the slate-leave was worth, what was a fair rental or royalty upon the several kinds produced, that is roofing, school slates, and mantel or blackboard stock. The witnesses called by both sides for said purposes were experts. The positions of opposing counsel are also made plain by a statement of the questions put to the experts called by them respectively. The questions to all were not precisely in the same words, they were substantially identical.

Question to Wm. J. Griffith, called by the plaintiff: "Suppose this quarry to be open and uncovered, the beds of roofing

slate exposed and ready to be worked, appliances at hand to hoist, and the beds of slate so formed as to be easily worked, what in your opinion would it cost per square to take out, hoist and split roofing slate?" "Under the same state of facts, what would it cost to quarry, hoist and split mantel material an inch thick?" "Under the same state of facts, what would it cost per 1000 for taking out, hoisting and splitting school slate on the bank when school slate are selling at $9 per 1000 in the rough?"

Question to Dr. A. P. Steckel, called by defendant: "Taking into consideration the condition of the quarry in the years 1880, 1881 and 1882, its state of development, the character of the improvements, machinery and fixtures about it for the quarrying of slate, what, in your judgment, between October, 1880, and August, 1882, would have been a fair royalty to be paid to its owner on roofing slate per square, school slate, in the rough, per thousand, 7×11, and mantel and blackboard material, in the rough, per square foot, measured an inch thick, considering in your estimate the character of this quarry, and the beds of slate, the facilities, and lack of facilities for working, and ruling rates of royalty in that region during that period?"

I have said that the witnesses referred to were experts. The fact is, that they, or nearly all of them, I mean those called by both sides, were familiar with this quarry, the Williams-Fulmer quarry.

The learned master adopted the view of plaintiff.

\*    \*    \*    \*    \*    \*    \*    \*

What mode is to be adopted to reach the value of the slate in place in the quarry? That which will give the truer result. For said act of 1850 makes it our duty to ascertain what is justly and equitably due. Both methods cannot be followed under the evidence in the case, or made available to reach a correct conclusion. The respective results differ too widely. The one makes the value of the slate in question in place more than three hundred per cent greater than the other.

To solve this problem regard must be had to the circumstances. In what is termed in this case "the Slatington slate region," there are many slate quarries. They extend over miles of territory. There are various veins or beds of slate,

Opinion of Court below.

the run and qualities of which seem to be understood. The quarrying of slate and manufacturing of articles from it is the leading industry in that section of the country. In the nature of things, men are familiar with every phase of the business, the same as men engaged in any other established business are familiar with its particulars. That this is so, can be inferred from the testimony. The value of the slate in place is, perhaps, one of the things that is best understood.

Probably no two slate quarries are alike, or can be worked in exactly the same way and with the same results. But that is also true of all kinds of mines and quarries, yet where there are many places near each other, where the same mineral or stone is taken out, the deposit acquires a known value; there is an approximate value which for practical purposes is the real one. Such estimate enters into the value of the land when it is bought and sold, a value of the mineral distinct from that of the land unaffected by the mineral. In such cases grants, leases of the mineral, are frequent with a stipulated price for the product taken from time to time at so much a ton, or the like. That leases of that kind of slate quarries in the Slatington region are common, appears from the evidence.

From the testimony of defendant's witnesses it appears that an estimate can be formed of the slate here in question while in place; that quarries in that region are worked under leases where the landlord is paid at a certain sum per square, or foot, or by a percentage on the market price of the manufactured product. Defendant called a number of witnesses whose testimony shows that they are well informed concerning slate quarries in that region and the working of them; with what is usually paid in the neighborhood as royalty; that said witnesses were familiar with this quarry and its condition, including its equipment for working at the time in question, and the facilities for transportation. An examination of the testimony of Messrs. Shenton, Neff, Krum, Steckel, Kuhns, McKenna and Caskie, is convincing as to what has just been stated. It shows a knowledge by those witnesses of the value of slate leave, where no quarries are opened; where there are quarries and where quarries are supplied with machinery and necessary appliances, as was the case here. And in the light of that knowledge and of a knowledge of this quarry, its equipments

and facilities for transportation, as it was at the time in question, they state what they believe this slate was worth in place, what the slate-leave or royalty for it was worth at a fair estimate. That evidence gives a safer basis than the method and evidence upon which the master acted.

\*    \*    \*    \*    \*    \*    \*    \*

The evidence shows that the value of the slate in place fixed by the master is too high. The real value cannot be reached by taking the market value of the finished roofing slate and of the split school slate and mantel stock, and deducting what is believed, or that can be found from this evidence to have been the cost of production. We must be guided by the testimony concerning the value in the quarry, the royalty or slate-leave. Upon a consideration of the testimony of defendant's witnesses above named, I believe that a just conclusion is that the material was worth in place the sums following: roofing slate 45 cents a square, school slate $1 a thousand, and mantel and blackboard stock 1½ cents a square foot an inch thick.

\*    \*    \*    \*    \*    \*    \*    \*

The credits allowed defendant for excavating and for repairing boilers, etc., must be rejected for evident reasons. It must be taken that those were expenses of working the quarry, for none of which is the plaintiff liable under the view of the case taken by the court.

In accordance with the foregoing opinion, the court stated an account charging the defendant with the value of the roofing slate, at 45c. per square; school slates, at $1 per 1000; mantel stock at 1½c. per foot; with rent received by the defendant and taxes paid by plaintiff, making in all $3,540. The defendant was then credited with the amount of taxes paid by himself, which left a balance of $3,409.54, one third of which, to wit, $1,136.51, with interest, to wit, $375.21, amounting to $1,511.72, was decreed to be paid by the defendant to the plaintiff. Thereupon, the plaintiff took this appeal specifying, in substance, that the court erred in sustaining the defendant's exceptions to the master's report, and in entering the foregoing decree.

*Mr. Edward Harvey*, for the appellant.

Counsel cited: Section 27, statute 4 Anne, c. XVI., § 27,

Roberts's Dig. 48*; Act of April 25, 1850, P. L. 573; Coleman's App., 62 Pa. 277; Coleman v. Coleman, 2 Pears. 495; Job v. Patton, L. R. 20 Eq. C. 84; Lynn Co. v. Brogden, L. R. 11 Eq. C. 188; Coleman v. Coleman, 1 Pears. 470; Hoff v. McDonald, 22 Ga. 131; Jones v. Harraden, 9 Mass. 540; Borrell v. Borrell, 33 Pa. 492; Gillis v. McKinney, 6 W. & S. 78; Jesus College v. Bloome, 3 Atk. 262; Story v. Lord Windsor, 2 Atk. 630; Parrott v. Palmer, 3 Myl. & K. 632 (10 Eng. Ch. 631); Bainbridge on Mines, 509.

*Mr. R. E. Wright*, for the appellee.

OPINION, MR. JUSTICE GREEN:

There is but a single and very narrow question for decision in this case. It is agreed on both sides that the defendant shall account to the plaintiff for the value of the slate in place. But in the determination of what was the value of the slate in place, the master adopted one method and the court another. The master held that the value of the slate on the bank, less the cost of mining and putting it there, with a margin for a fair and reasonable profit to the operator, represented the value of the slate in place, and therefore charged the defendant with the valuation thus produced. The court, however, held that the value of the royalty or slate-leave which could be obtained for the privilege of removing and manufacturing the slate was the true representative of the value of the slate in place, and therefore reversed the finding of the master and charged the defendant upon the latter principle. The difference in the resulting figures is very considerable and only one of the two methods can be correct.

The act of April 25, 1850, P. L. 573, which subjects tenants in common in possession of mineral lands to accountability to their co-tenants for minerals taken out, provides only that the sum which " may be justly and equitably due," shall be ascertained and paid. This language is perhaps sufficiently general to give rise to different views as to what sum it is that " may be justly and equitably due " in any given case, and the solution of the question depends somewhat upon the circumstances of the particular case, and somewhat upon the true character of the relation existing between the parties. If the relation

were one of partnership, of course the accounting partner would be responsible for whatever profit he might realize out of his dealing with the partnership property. In that view of the case the master's measure of liability would be certainly correct in any event, and doubtless a still more rigid accounting than he applied would have to be enforced. But the relation of tenants in common of land is not in any sense a relation of partnership. The tenant in possession may lawfully remain in possession and may take minerals or other valuable products for his own advantage. His ownership is such that he cannot take his own share, without also at the same time and by the same act taking the share of his co-tenant. But in mining operations there is always more or less expense and risk which must necessarily be incurred by the person who conducts them. The tenant out of possession incurs none of the risk or expense, when the mining operations are conducted exclusively by the tenant who is in possession. Nevertheless, he is entitled to be compensated for the appropriation by his co-tenant in possession for his proportion of the mineral taken by the latter, whether the appropriation be profitable or otherwise to the taker.

This view of the subject simplifies and narrows the scope of the inquiry. For the thing taken is mineral in place, as it lies in a state of nature. It is this of which the tenant out of possession is deprived, and it is this for which he ought to be compensated. Where the mineral land has never been developed and no mines or quarries have been opened, the fair market value of the mineral in place, which would be the value of the privilege of removing it, in view of all its special circumstances, would represent the true measure of compensation to the owner. So, too, if the land were fully developed and mines or quarries opened, and all the expenses incurred which enable the operator to proceed at once to the taking of the mineral, the value of the mineral in place, ready to be taken, would be enhanced by these considerations, and the price of the privilege of taking it in such circumstances would also represent the measure of compensation. It is manifest that in conducting this inquiry in a litigated case, regard should be had to all the circumstances of the particular case, and the evidence should be directed to the special instance of the mine or quarry in question.

A reading of the testimony taken before the master shows that this is precisely what was done in the present case. On the part of the defendant a number of witnesses, all of them having competent knowledge of the property, and being themselves engaged in the same business and thoroughly qualified to speak of the value of the privilege of removing the slate from this particular quarry, testified to their opinion of the value of that privilege as represented by a fixed price for the several kinds of slate produced. They took into their view all the circumstances of advantage and disadvantage in mining, preparing and marketing the slate taken, and expressed their results in definite figures. Reviewing carefully and as we think correctly, the whole of this testimony the learned court below determined upon certain values for school slate, roofing slate, and mantel and blackboard stock taken out, and embodied them into a resulting decree, the fundamental idea of which was that they represented the royalty or slate-leave at which the quarry could have been let. For the legal correctness of this treatment of the subject the case of Neel's App., 3 Penny. 66, was referred to, and it appears to support the reasoning of the court and the defendant's contention. We think, moreover, it is the just and equitable method of determining the value of the slate in place, when compensation for its removal is claimed by a tenant out of possession against a co-tenant in possession.

The learned master reached a different conclusion as to the manner of determining the value of the slate in place, influenced largely by the decision of this court in the case of Coleman's App., 62 Pa. 252. An examination of that case however proves that it was altogether exceptional in its character, and was expressly limited to the particular facts under consideration. The general principles stated in the opinion are in entire harmony with the views herein expressed. Thus, Mr. Justice SHARSWOOD, in delivering the opinion, said: "The value of the ore in place is, therefore, the only just basis of account. That is the same as the value of the ore-leave ; that is, what the right to dig and take the ore is worth." He then inquires, "But how is the value of the ore-leave to be ascertained?" He proceeds to review the special facts of the case and says that the value of the ore at the pit's mouth depends

Opinion of the Court.

upon its quality, it proximity to the furnace where it is to be used, and the means of transportation; that, in addition to this, the price of the ore-leave will be influenced by the expense and risk of mining; that the price paid for ore-leave in other mines affords no criterion for this; that no sales of Cornwall ore-leave had ever been made, and that no evidence was given before the master as to what ore-leave from this bank would have commanded on the market. He adds, that the master arrived at the value of the ore in place by ascertaining its value at the pit's mouth and then deducting from that the cost of mining, and says: "We cannot see that under all the circumstances any more just and equitable mode could have been adopted." But he takes care to say further: "We do not mean to say that it would hold in any other case than the one now before the court; certainly not, where the mining is expensive and hazardous . . . . . But the case of the Cornwall ore banks is very different and very peculiar. Very little outlay of capital was required. The wages of day laborers, and the pick axe and shovel, with occasional charges of powder for blasting, made up all that was provided. The returns were immediate; the ore was removed to be used or sold as soon as loosened. No personal skill or superintendence by the tenants in common was shown, and whatever was necessary was hired and allowed in the cost of mining." The whole tendency of the opinion was to show that there was no substantial difference between the value of the ore in place and its value at the pit's mouth, except the mere cost of digging and of removing it from the one place to the other. This, added to the fact that there never had been any sales of ore-leave at the Cornwall banks, and no proof of the opinions of experts as to what such ore-leave was worth, impelled the adoption of the principle upon which the value of the ore-leave was determined. There was in fact no other method which could have been adopted in that case under the evidence on the record.

In the present case, it is only necessary to note the fact that abundant evidence was given as to the value of the royalty or slate-leave, in this particular quarry, by very experienced persons who knew it well and had long been engaged in the same business; and the further fact that the value of the slate on the bank included, in addition to the cost of severance and re-

moval, the cost also of splitting, dressing and piling the roofing slate, and splitting the school slate and mantel and blackboard stock. In addition to this, personal skill and superintendence were required. As to the roofing slate the whole profit of manufacture thus enters into its cost on the bank, and a portion of that profit enters into the cost of the school slate and other stock. It follows, that if the method adopted by the master is pursued, the plaintiff would recover, in addition to the real value of the slate in place, a share of the profits of carrying on the business without being subject to the risks or possible losses which might accrue, and this we think would not be just and equitable. The amounts allowed by the court are very fair and liberal to the plaintiff, under all the evidence, and he has no just cause of complaint.

The case of Ege v. Kille, 84 Pa. 333, was not a proceeding between tenants in common, but an action of trespass for mesne profits, and therefore a rather more stringent rule of accounting would be applicable to its facts. But, in addition to that consideration, it was a case of iron ore mining and came practically within the exceptional doctrine of Coleman's Appeal, supra, which it simply followed. That doctrine however, as we have seen, has no general application, and is not controlling in cases circumstanced like the present.

The decree of the court below is affirmed and appeal dismissed at the cost of the appellant.