SILVER KING COALITION MINES CO. OF NEVADA v. SILVER KING CONSOL. MINING CO. OF UTAH.

SILVER KING CONSOL. MINING CO. OF UTAH v. SILVER KING COALITION MINES CO. OF NEVADA.

(Circuit Court of Appeals, Eighth Circuit. April 5, 1913.)

Nos. 3,646, 3,687.

*(Syllabus by the Court.)*

1. CONTRACTS (§ 330*)—MINES—PROMISE TO PAY DEBT OF ANOTHER—SUIT IN EQUITY BY CREDITOR—FACTS—CONCLUSION.

The K. Co. and the C. Co. were equal owners and tenants in common of a mining right. The K. Co. secretly extracted ore therefrom, failed to account therefor, and conveyed its property to the M. Co., which, in consideration of that conveyance, assumed and agreed to pay all the debts and obligations of its grantor.

*Held,* a suit in equity can be maintained by the C. Co., or its assignee, against the M. Co., without the presence of the K. Co. to enforce the contract of the M. Co. to pay the obligation of its grantor to account to the C. Co. for the latter's share of the value of the ore the K. Co. extracted from the common property.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1589, 1591–1594, 1596, 1597, 1602–1604; Dec. Dig. § 330.*]

2. CONTRACTS (§ 187*)—MINES—CREDITORS' SUIT IN EQUITY ON PROMISE OF THIRD PERSON TO PAY HIS CLAIM.

When a grantee contracts with his grantor to pay the latter's debt or obligation in payment, or in part payment, for the conveyance, the creditor may accept and appropriate that contract to himself, and maintain a suit in equity upon it. In equity, the grantee then becomes the principal debtor, the grantor the surety, and the creditor is substituted for the promisee or grantor.

It is immaterial in equity whether or not the contract was made or intended for the benefit of the creditor.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec. Dig. § 187.*]

3. EQUITY (§§ 94, 96*)—"INDISPENSABLE PARTY"—PROPER PARTY—ORIGINAL DEBTOR NOT INDISPENSABLE PARTY.

In the federal courts, a suit in equity may proceed without any necessary or proper party, who is not an indispensable party, if his presence would oust the jurisdiction of the court.

An "indispensable party" is one who has such an interest in the subject-matter of the controversy that a final decree cannot be rendered between the other parties to the suit without radically and injuriously affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience.

The original debtor is not an indispensable party to a suit in equity by his creditor on the promise of the grantee of the debtor to pay the creditor's claim.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 246–252, 253–256; Dec. Dig. §§ 94, 96.*

For other definitions, see Words and Phrases, vol. 4, p. 3559.]

4. CONTRACTS (§ 187*)—WORDS AND PHRASES—"DEBTS AND OBLIGATIONS"—LIABILITY FOR THE APPROPRIATION OF ANOTHER'S ORE.

A promise to pay all the "debts and obligations" of another includes the promise to pay its obligation to account and pay to a cotenant the latter's share of the proceeds of ore which the grantor has extracted from the common property and sold.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec. Dig. § 187.*

For other definitions, see Words and Phrases, vol. 2, pp. 1864–1886; vol. 8, p. 7628.]

5. APPEAL AND ERROR (§ 1011*)—REVIEW—QUESTIONS OF FACT—FINDINGS—PRESUMPTION.

Where a court has considered conflicting evidence, and made a finding or decree, it is presumptively correct; and unless some obvious error of law has intervened, or some serious mistake of fact has been made, the finding or decree must be permitted to stand.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3983–3989; Dec. Dig. § 1011.*]

6. MINES AND MINERALS (§ 51*)—DAMAGES—MEASURE OF—WILLFUL TRESPASS.

The measure of damages for the reckless, willful, or intentional taking of ore or timber from the land of another without right is the enhanced value of the ore or timber when it is finally converted to the use of the trespasser, without allowance to him for the labor bestowed or expense incurred in removing it and preparing it for market.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 137–141; Dec. Dig. § 51.*]

7. TRUSTS (§ 322*)—TENANCY IN COMMON (§ 22*)—ACCOUNTING BY TRUSTEE—BASIC PRINCIPLE IN EQUITY—ALLOWANCE OF EXPENSE OF MINING.

The basic principle of an accounting by a trustee in equity is that the account should be so stated that the trustee shall make no profit by his use of the property of the cestui que trust and the latter shall receive the value of his property and its income.

A cotenant has the right to extract ore from the common property and sell it, accounting for the proceeds, less the reasonable expense of mining and marketing.

Where the fundamental rule of an accounting can be complied with by allowing to the cotenant, who is a trustee for his fellow, the expenses of mining and marketing the ore, the measure of damages for a willful trespass is not necessarily applicable to the case, although the cotenant who extracted the ore intended to appropriate all of it to himself, con-

cealed his acts, kept no accounts, caved the stope, and made it difficult and expensive to ascertain the volume and value of the ore taken.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 480; Dec. Dig. § 322;* Tenancy in Common, Cent. Dig. § 63; Dec. Dig. § 22.*]

**8. TRUSTS (§ 309*)—ACCOUNTING BY TRUSTEE—COMPOUND INTEREST.**

Where the basic principle of an accounting by a trustee can be given effect without charging him with compound interest on the amount which he has held for his cestui que trust, it is not error to refuse to make such a charge.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 429; Dec. Dig. § 309.*]

Appeals from the Circuit Court of the United States for the District of Utah; John A. Marshall, Judge.

Bill by the Silver King Consolidated Mining Company of Utah against the Silver King Coalition Mines Company of Nevada. Decree for complainant, and both parties appeal. Modified and affirmed.

W. H. Dickson, of Salt Lake City, Utah (A. C. Ellis, Jr., and Russell G. Schulder, all of Salt Lake City, Utah, on the briefs), for appellant in No. 3,646 and for appellee in No. 3,687.

Andrew Howat and Edward B. Critchlow, both of Salt Lake City, Utah (Herbert R. Macmillan and William J. Barrette, both of Salt Lake City, Utah, on the briefs), for appellee in No. 3,646 and for appellant in No. 3,687.

Before SANBORN and CARLAND, Circuit Judges, and WILLIAM H. MUNGER, District Judge.

SANBORN, Circuit Judge. The Silver King Mining Company, a corporation of the state of Utah, and the Silver King Consolidated Mining Company, a corporation of the state of Wyoming, were equal owners and tenants in common of the Vesuvius mining claim, which was situated in the state of Utah, from 1901 until June 19, 1907. During that time the King Company secretly extracted from that claim and sold a large amount of valuable ore without accounting to its cotenant for any of it, and on June 19, 1907, it sold and conveyed all its property to the Silver Coalition Mines Company, a corporation of the state of Nevada and the defendant below, and in part payment for that conveyance the Coalition Company agreed to pay all the outstanding debts and obligations of its grantor, the King Company. The Coalition Company then secretly extracted ore from the Vesuvius claim and sold it, without accounting to its cotenant for this ore or its proceeds. On February 24, 1908, the Consolidated Company of Wyoming conveyed all its title and interest in the Vesuvius mining claim, and in its cause of action against the Coalition Company on account of the extraction of the ores by the King Company and by it, to the Silver King Consolidated Mining Company of Utah, a corporation of that state and the complainant in this suit. On May 26, 1908, the latter company exhibited its bill in equity in the court below against the Coalition Mines Company of Nevada, and prayed, among other things, for an accounting and recovery of one-half of the value of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

ores extracted by it and by its grantor, the King Company. The defendant demurred, it subsequently answered, issues were joined, evidence was taken, and upon final hearing a decree was rendered that the defendant was indebted and should pay to the complainant $735,-045.87 on account of the ores taken from the Vesuvius claim by the defendant and by its grantor. Both parties have appealed from that decree and specified many alleged errors.

(A) The defendant insisted by demurrer and motion in the court below, and still insists, that the King Company was an indispensable party to the cause of action to recover the value of the ore which its grantor, prior to the latter's conveyance on June 19, 1907, extracted and sold; but the Circuit Court overruled that contention, and its ruling is specified as error.

[1] When a grantee contracts with his grantor to pay the latter's debt or obligation in payment, or in part payment, for the conveyance, the creditor or obligee may accept and appropriate that contract to himself and maintain a suit in equity to enforce it. In that event the grantee becomes the principal debtor and the grantor the surety, and the creditor's suit stands on the equitable doctrines that the creditor may have the benefit of any security or obligation given by the principal debtor to the surety, and that to avoid circuity of action—that is to say, an action by the creditor against the original debtor and a subsequent action by the latter against his grantee—the creditor may be, and is in equity, substituted for the promisee, the grantor. Keller v. Ashford, 133 U. S. 610, 623, 625, 626, 10 Sup. Ct. 494, 33 L. Ed. 667; Johns v. Wilson, 180 U. S. 440, 447, 21 Sup. Ct. 445, 45 L. Ed. 613; Thompson v. Cheesman, 15 Utah, 43, 48, 49, 48 Pac. 477; Blackmore v. Parkes, 81 Fed. 899, 900, 26 C. C. A. 670, 671.

[2] In this case the complainant, the creditor, has accepted the promise of the defendant, the grantee, to pay the obligations of the King Company, the grantor, and standing by substitution in the shoes of the King Company, the grantor, has brought this suit to enforce the covenant of the grantee.

[3] It is contended that this suit cannot be maintained for the value of the ore extracted by the King Company, because it was a necessary party to the suit for the value of the ore which it extracted, and it has not been made a party to this suit. But necessary parties, who are not indispensable parties, may be dispensed with in suits in equity in the national courts. An indispensable party is one who has such an interest in the subject-matter of the controversy that a final decree cannot be rendered between the other parties to the suit without radically and injuriously affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience. Every other party who has any interest in the controversy or subject-matter which is separable from the interest of the other parties before the court, so that it will not necessarily be directly or injuriously affected by a decree which does complete justice between them, is a proper party to a suit. But he is not an indispensable party, and if his presence would oust the jurisdiction of the court the suit may proceed without

him. Rogers v. Penobscot Min. Co., 154 Fed. 606, 610, 83 C. C. A. 380, 384; Sioux City Terminal R. & W. Co. v. Trust Company, 27 C. C. A. 73, 75, 82 Fed. 124, 126. The King Company, the grantor, is a corporation of the same state as the complainant, and its presence in this suit would, oust the jurisdiction of the federal courts.

Why is that corporation an indispensable party to this suit? Counsel for the defendant answer: Because the amount of the claim for the extraction of the ore taken by the grantor, the King Company, was unliquidated. But how can its liquidation in a suit between the creditor and the grantee alone radically and injuriously affect the interest of the grantor? Because, say counsel, in separate actions against a grantor and grantee, founded on the obligation of the former, different juries or courts might find different amounts recoverable, and because the grantor could not maintain an action against the grantee alone to enforce the latter's promise. Let the propositions that different courts and juries might find different amounts recoverable, and that the grantor could not maintain an action against the grantee alone to enforce the latter's promise, be conceded. Nevertheless the grantor cannot be injuriously affected by the creditor's suit and recovery against the grantee. The grantor was liable to a suit by the creditor on its obligation before the creditor's suit against the grantee was instituted, and if it is still subject to such a suit its liability is no greater since the suit and the decree against the grantee than it was before that suit was commenced. Counsel argue that if the creditor first recover a judgment of $100,000 against the grantor on its obligation, and subsequently recover a judgment of $200,000 against the grantee in an action on the grantee's promise to pay the grantor's obligation, the grantee would be subject to two judgments on the same promise—one for $100,000 in favor of the grantor on a suit which it might bring against the grantee, and one in favor of the creditor for $200,000. But the grantee could suffer no legal injury from the judgment for $100,000, because its payment of the judgment of $200,000 against it in favor of the creditor would discharge it from all liability on the judgment for $100,000 on the same obligation, on the ground that a party is required to make but one satisfaction of the same claim.

Counsel say that if the plaintiff, the creditor, should subsequently bring an action against the King Company, the grantor, and recover one-half the amount awarded by the final decree herein, the grantor could not recover of the grantee more than one-half the amount which the grantee is adjudged to pay to the creditor, and yet the creditor could recover of the grantee twice as much as it could from the grantor. But the creditor would not recover, nor would the grantee be required to pay, more than the just amount of its liability, and no one would be injuriously affected; for, against the mere supposition of counsel that a subsequent judgment for one-half the amount fixed by the decree in this case may be recovered by the creditor against the grantor, the amount adjudged by the decree of the court below in this suit, after full hearing, must be presumed to be right and just. Counsel contend that if the creditor should subsequently recover a judgment against the grantor on its obligation for double the amount fixed by

the decree herein, the grantor would be entitled to a judgment for that amount against the grantee. The supposition is too improbable for serious consideration. If the creditor subsequently sues the grantor, it is probable that it will be met by the answer that by the present suit the creditor elected to substitute itself for the grantor and in the latter's right to litigate with the grantee, whom it thereby made the principal debtor, while the grantor became the surety in this suit to determine the amount of the grantor's original obligation, that the grantee has obeyed the decree of the court and paid the amount thus adjudged due to the creditor, for, the presumption is that it will promptly obey the decree, and that, as the creditor can have but one satisfaction of the same claim, it is estopped by these facts from recovering any judgment or decree whatever against the grantor. And the probability that the creditor will overcome such an answer and recover such a judgment or decree is so remote as to be negligible. Moreover, these hypotheses of counsel present nothing but moot questions. It is improbable that they will ever rise to the dignity of living issues, and the argument based upon them is neither convincing nor persuasive.

On the other hand, the facts disclosed by the record satisfy that the grantor, the King Company, has no such interest in the subject-matter of the controversy in this suit that a final decree cannot be rendered between the creditor, the plaintiff, and the grantee, the defendant, without radically and injuriously affecting the interest of the grantor, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience. They convince that a decree between the creditor and the grantee, just and equitable to the latter, can be made and ought to be made in this suit, which will not in any way injuriously affect the interest of the grantor, the King Company, and that the latter is not an indispensable party to this suit. There was no error in the ruling of the court below to this effect. Keller v. Ashford, 133 U. S. 610, 626, 10 Sup. Ct. 494, 33 L. Ed. 667; Barker v. Pullman's Palace Car Co. (C. C.) 124 Fed. 555, 559, 570; Dancel v. Goodyear Shoe Machinery Co. (C. C.) 137 Fed. 157, 158, 159, 160, 161; s. c., 144 Fed. 679, 680, 75 C. C. A. 481, 482.

(B) It is specified as error that the court below held that the defendant grantee was liable to account to the creditor, the plaintiff, for the one-half of the value of the ore extracted by the grantor from the common property of the grantor and the Consolidated Company of Wyoming prior to June 19, 1907. The promise of the defendant, evidenced by the deed of all the property of the grantor which the grantee accepted, was to pay therefor, among other things, $3,750,000, and "all the outstanding debts and obligations of the grantor." The grantor owed its cotenant and creditor one-half of the value of the ore it had extracted from their common property. It was under a legal obligation to account for and pay to its cotenant one-half of that value, and without the aid of the ingenious arguments of counsel it would be difficult to perceive any reason why this obligation did not fall within the terms of the grantee's contract.

Counsel contend, however, that it does not do so because the word "debt" is without definite meaning in the law, and in this contract it

means a debt for a sum certain, and does not include one for an unliquidated amount, and because the word "obligation" is of the same character, and in this contract has the same meaning. In support of this position definitions of these words are quoted from text-books and opinions of courts; but after a thoughtful consideration of the authorities cited, and many others, an abiding conviction still remains that in this contract these words are so plain and their meaning is so clear and certain that there is no doubt that they include, and must be held to have been intended to include every liability of the grantor of such a nature as that here in suit. The use of the words "debts" and "obligations" is so common that an exhaustive review of opinions concerning their meaning is impossible within the limits of the opinion of a court, and a partial review might be confusing or misleading. The conclusion which has been reached, however, is readily deducible from the terms of the contract and from familiar rules of construction.

[4] Words and phrases should be given their popular sense and meaning, unless there is a clear indication that they were used in a different sense. The popular sense of a word or phrase is that sense which people conversant with the subject-matter with which the contract is dealing would attribute to it. When a word which has a known legal meaning is used in a contract, it must be assumed that it was used in its legal sense, in the absence of a clear indication of a contrary intent. The legal presumption is that words in a contract are used in their usual sense, unless it clearly appears that the parties intended to use them in a different or more restricted sense. Apply these indisputable canons of interpretation to the words and terms of this contract. The popular, the customary, and the legal sense of the word "debt" in a contract to pay all the debts of a party is not, in our opinion, limited to obligations to pay certain sums of money; and, if it is so limited, the popular, the customary and the legal sense of the broader word "obligation" includes every duty "which has a binding operation in law and which gives to the obligee the right of enforcing it in a court of justice." 2 Bouvier's Law Dictionary, page 534. The contract of the defendant is to pay all the debts and obligations of the grantor. The word "obligations" may not be ignored, nor may it be restricted to the more limited meaning of the word "debts"; for in the construction of the agreement tautology must be avoided, and all the words of the contract must be given meaning and legal effect (Keith v. Haggart, 4 Dak. 438, 33 N. W. 465, 468; Ullman v. Chicago & N. W. Ry. Co., 112 Wis. 150, 88 N. W. 41, 47, 88 Am. St. Rep. 949; Fitzgerald v. First National Bank, 114 Fed. 474, 52 C. C. A. 276), and the grantor was certainly bound, by operation of law, to account for and to pay to its cotenant one-half of the value of the ore it had extracted from their common property, and the cotenant had the right to enforce that obligation in a court of justice.

The grantee was a new corporation, formed apparently to succeed to the rights of the grantor, to take all its property, and to acquire other interests. Most, if not all, of the stockholders of the grantor received stock of the grantee in payment of their respective shares of the $3,750,000 paid by the grantee for the grantor's prop·

erty and surrendered their stock in the grantor. Keith was the president, and Kearns was the vice president and manager of the grantor, and they were also stockholders and directors of the grantee, when the conveyance to it was accepted, and they voted for the resolution which authorized the grantee's contract to pay all the debts and obligations of the grantor. There were seven other directors in the board of the grantee. Keith and Kearns had conducted the grantor's extraction of the ore from the common property, and necessarily knew all about it; but they claim that they thought that the grantor was not indebted to its cotenant, because they believed that the expense of finding and taking the ore out of the ground exceeded the proceeds obtained from it. The other seven directors testified substantially that they were aware of three or four other obligations contracted by the grantor, but that they were ignorant of the extraction of this ore and of the grantee's liability therefor, and that they never intended to authorize a contract by the grantee to pay for it. The foregoing facts were proved by counsel for the grantee, and they rely upon them to reach the conclusion that the parties to the contract never intended that the grantee should agree by its promise to pay the grantor's obligation to account for the ore thus extracted. They contend that their evidence proves that the grantee was ignorant of the obligation arising out of the taking of the ore, and, while this is not admitted, it is conceded for the purpose of the discussion and determination of the question here at issue.

Counsel invoke the general rule that the purpose of all interpretation of the words and terms of a contract is to ascertain the sense or meaning in which the parties to it used them when their minds met upon the stipulations of the agreement, and they then argue that inasmuch as the grantee was aware of three or four other obligations contracted by the grantor, and was ignorant of this one, the parties to the contract intended to exclude it from the meaning of the words "all the debts and obligations of the grantor." But the words and terms of this agreement are clear, and their meaning is not doubtful. It is ambiguous words and terms of doubtful meaning in a contract only that are susceptible to interpretation by the situation of the parties and the circumstances surrounding them when they made them. The secret intentions of parties to a contract, the words and terms of which are clear, free from ambiguity, and inexpressive of the intention, may not be imported into it by construction. Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 114 Fed. 77, 80, 52 C. C. A. 25, 28 (57 L. R. A. 696). And:

"Where, without fraud, accident, or mutual mistake (and none of these has been pleaded or proved in this case), the written contract purports to be a memorial of the transaction, it supersedes all prior representations, proposals, and negotiations, and is conclusive evidence that it embodies such of these as were ultimately intended to become parts of the agreement, and that all others were rejected as not expressing the final intention of the parties. * * * The law controlling the operation of a contract is deemed to be, and usually is actually, within the contemplation and intention of the parties, as much as the words in which it is expressed, and becomes equally an

essential part of it. * * * For this reason the rule that a written contract cannot be varied by parol extends to the legal import or intendment of the contract, as well as to the terms or words in which it is written." Union Selling Co. v. Jones, 128 Fed. 672, 676, 63 C. C. A. 224, 228; Elliott on Evidence, pp. 646, 647.

By the plain terms of the contract the grantee agreed to pay all the debts and obligations of the grantor. It was not a contract to pay all the debts and obligations of the grantor listed or named in the agreement, for none was listed or named, nor all except those unknown to the grantee, nor all the debts and obligations of the grantor except the obligation to pay for one-half of the ore which the grantor extracted from the Vesuvius claim; and because the grantee, at the time it made the contract with the grantor, had the opportunity to require the insertion of any of these limitations and exceptions it desired in its contract, and it did not do so, but permitted and induced the grantor to join in and perform it in reliance upon the grantee's promise to pay all its debts and obligations without exception, it is now estopped from importing into its promise by construction any of these limitations or exceptions. Insurance Company v. Mowry, 96 U. S. 544, 547, 24 L. Ed. 674. This is a natural, reasonable, and righteous conclusion. This agreement by the grantee to pay all the debts and obligations of the grantor was a natural and reasonable requirement of the grantor, which was parting with all its property, with all its means to pay its debts and obligations; and the evidence of the situation, knowledge, intention, and circumstances of the parties which counsel for the grantee have produced, if admissible and carefully considered, as it has been, would fail to convince that these parties ever intended that the conveyance should be made without such a contract. The obligation of the grantor to account for and pay to the predecessor of the complainant the value of one-half of the ore extracted by the grantor from the Vesuvius claim fell far within the terms and meaning of the agreement of the grantee to pay all the debts and obligations of the grantor.

The next contention is that the creditor, the complainant, cannot maintain this suit on the contract of the grantee, because the grantor itself could not have maintained it. But for the reasons already stated the grantor could have maintained a suit upon the contract of the grantee, in the absence of fraud, mutual mistake, accident, or rescission, and none of these has been pleaded or proved in this case. Moreover, while the general rule is that the suit of a creditor against the grantee, founded on the latter's promise to the grantor, is subject to the same defenses as the suit of the grantor would have been, the exceptional facts of this case place the creditor in a much stronger position than the grantor itself would have had. The assignor of the complainant was a creditor of the grantor when the conveyance of all its property to the grantee was made, and the complainant has succeeded to all the rights of its assignor. A "transfer of property by a debtor with the reservation of an interest therein to himself" is always fraudulent and voidable by his creditors as

against a debtor and all claiming under him with notice of his act, and a transfer by stockholders of a corporation of all its property to another corporation, in consideration that they receive stock or bonds of the grantee in exchange for their stock in the grantor, is equally fraudulent in law as to the unpaid creditors of the grantor, and renders the grantee liable for their claims. Northern Pacific Ry. Co. v. Boyd, 177 Fed. 804, 101 C. C. A. 18; Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616; Hurd v. New York & Commercial Steam Laundry, 167 N. Y. 89, 60 N. E. 327; Montgomery Web Co. v. Dienelt, 133 Pa. 585, 596, 19 Atl. 428, 19 Am. St. Rep. 663; Railroad Co. v. Howard, 74 U. S. (7 Wall.) 392, 409, 19 L. Ed. 117; Central of Georgia Railway Co. v. Paul, 93 Fed. 878, 884, 35 C. C. A. 639.

In the case at bar, most, if not all, of the stockholders of the grantor took stock of the grantee in exchange for their stock in the grantor, and in consideration of this exchange caused all the property of their corporation to be conveyed to the grantee. If, therefore, as counsel for the grantee argue, the grantee did not make a valid agreement with the grantor to pay its obligation to the assignor of the complainant, the conveyance of the grantor's property to the grantee was fraudulent as to the assignor and is fraudulent as to the complainant, and on that ground the grantee is liable to pay the claim of the complainant, for the property of the grantor which the grantee received was worth much more than the amount of this claim. The contention that the grantor may escape liability here, either because the grantor could not maintain an action upon its promise, or because the obligation of the grantor to account and pay for the ore was not within the terms of the promise, cannot be sustained.

Finally, it is insisted that the creditor has no right of action on the grantee's promise to the grantor to pay the creditor's claim because it does not appear that this contract was made for the creditor's benefit, and that it was the party intended to be benefited thereby. The following language of Judge Folger is quoted from Simson v. Brown, 68 N. Y. 355:

"It is not every promise made by one to another, from the performance of which a benefit may inure to a third, which gives a right of action to such third person; he being neither privy to the contract, nor to the consideration. The contract must be made for his benefit as its object, and he must be the party intended to be benefited."

Many authorities are cited that have repeated or approved this statement of the law. Austin v. Seligman (C. C.) 18 Fed. 519, 522; Sayward v. Dexter, Horton & Co., 72 Fed. 758, 764, 765, 19 C. C. A. 176; Constable v. National Steamship Co., 154 U. S. 51, 74, 14 Sup. Ct. 1062, 38 L. Ed. 903; American Exchange National Bank v. Northern Pacific Ry. Co. (C. C.) 76 Fed. 130; Central Trust Co. v. Berwind-White Coal Co. (C. C.) 95 Fed. 391; Electric Appliance Co. v. United States Fidelity & Guaranty Co., 110 Wis. 434, 85 N. W. 648, 53 L. R. A. 609, 613; Parker v. Jeffery, 26 Or. 186, 37 Pac. 712; Burton v. Larkin, 36 Kan. 246, 250, 13 Pac. 398, 59

Am. Rep. 541; Howsmon v. Trenton Water Co., 119 Mo. 304, 308, 24 S. W. 784, 23 L. R. A. 146, 41 Am. St. Rep. 654; Wright v. Terry, 23 Fla. 160, 2 South. 6. But none of these cases was a suit in equity and in none of them were the equitable doctrines that a creditor may have the benefit of any security or obligation given by the principal debtor to the surety, and that, to avoid circuity of action, the creditor may be, and is, when he sues upon the contract of the grantee to pay the latter's indebtedness to the creditor, in equity substituted for the grantee and promisee; upon which this suit stands, either invoked or available. Authorities are conflicting upon the proposition that it is essential to the maintenance of an action at law by the creditor of a grantor upon the contract of his grantee to pay the grantor's debts that the contract should be made for the creditor's benefit as its object and that he should be the party intended to be benefited. Coster v. Mayor, 43 N. Y. 399, 411, and cases there cited; Arnold v. Nichols, 64 N. Y. 117, 119.

That, however, is a moot question in this case. It is unnecessary to consider or discuss it, and it is here dismissed, because this is a suit in equity, and not an action at law. In such a suit it is sufficient that the grantee has agreed with the grantor to be primarily liable for the latter's obligation to the creditor, so that, as between the parties to the agreement, the first is the principal and the second the surety. The creditor of the surety is then entitled in equity to be substituted in his place, and to maintain his suit against the grantee to the same extent as the grantor could have maintained it, and it is immaterial whether the contract was made and intended for the benefit of the creditor or of the grantor, for the creditor has all the rights of both to enforce the obligation of the grantee. Keller v. Ashford, 133 U. S. 610, 623, 10 Sup. Ct. 494, 33 L. Ed. 667, and the authorities there cited; Barker v. Pullman's Palace Car Co. (C. C.) 124 Fed. 555, 568, 569; Willard v. Wood, 164 U. S. 502, 519, 520, 17 Sup. Ct. 176, 41 L. Ed. 531; Johns v. Wilson, 180 U. S. 440, 447, 448, 21 Sup. Ct. 445, 45 L. Ed. 613. There was no error in the decision of the court below that the grantee, the defendant, was liable to account and pay to the creditor, the complainant, for the half of the value of the ore extracted by the grantor from the Vesuvius claim prior to June 19, 1907, and that the complainant could maintain this suit in equity to enforce that accounting and payment on the promise of the grantee to the grantor to pay all the latter's debts and obligations.

(C) The court below found that the value of one-half of the ore extracted from the Vesuvius claim by the defendant and its grantor was $516,264.47, and that the complainant was entitled to recover from the defendant this sum and interest thereon at 8 per cent. per annum from January 1, 1906, which amounted in the aggregate to $735,045.87 on April 17, 1911, when the decree for that amount was rendered. The complainant and defendant complain of this amount, the former that it is too small, the latter that it is too large, and by numerous specifications of error challenge the controlling facts which the court found and used to ascertain it. As the defendant

stands in the shoes of the grantor in this accounting, the acts, omissions, and intent of the latter will henceforth be treated as those of the former, and the grantor will be ignored. The defendant secretly entered the Vesuvius claim beneath its surface by means of a deep shaft, which it sunk from adjoining claims, which it owned in severalty, and, working by means of levels running from this shaft, extracted the ore, mixed it with the ores it took from the claims it owned in severalty, sold the combined product, and kept all the proceeds. It kept no account of the ore which it took from the Vesuvius claim, and gave no notice to the complainant's grantor that it was extracting it, and that grantor was in ignorance of that fact until the ore was gone.

The court below was compelled to ascertain the amount and value of this ore from more than 4.000 printed pages of evidence. It found from this evidence these facts: The extent of the excavation in the Vesuvius claim was 573.937 cubic feet. After the excavation was made there remained in the cavity 435,350 cubic feet of caved and waste material, and 31,551 cubic feet of like material had been removed, so that the entire amount of this material was 466,901 cubic feet. This material, when it was in place in the cavity, occupied only one-half of the space which it filled after it was extracted, or only 233,450 cubic feet. Deducting this amount from the 573,937 cubic feet in the excavation, there remained 340,487 cubic feet of the cavity which must have been originally occupied by the ore which the defendant removed. This ore was of two classes: There were 18,916 tons of ore of the first class, from which the defendant realized $60.07 per ton, in all $1,136,284.12. The cost of mining, tramming, and smelting this ore was $6.33 per ton, or $119,738.28, which left the net proceeds from it $1,016,545.84. There were 14,187 tons of second-class ore, whose net value was $3.53 per ton, in all $50,080.11. The sum of $1.016,545.84 and $50,080.11 is $1,066,625.95. The cost of the work done by the defendant within the Vesuvius claim in developing the ore was $34,097. Deducting this amount from $1,-066,625.95, there remains $1,032,528.95, the total net value of the ore taken from the Vesuvius claim by the defendant. One-half of this amount, or $516,264.47, and the interest thereon, is the amount which the court found from these facts the defendant owed the complainant for its share of this ore.

[5] Each of the findings of fact from which the court deduced this conclusion is vigorously assailed by each of the parties to this suit in oral argument and in briefs which contain many hundreds of printed pages. Each of them has been carefully examined, with the aid of these arguments and briefs, and in the light of the evidence to which they refer, and has been found to have been deduced from conflicting testimony, and many of them from evidence very evenly balanced. These findings, therefore, fall far within the familiar rule that, where a court has considered conflicting evidence, and made a finding or decree, it is presumptively correct, and unless some obvious error of law has intervened, or some serious mistake of fact has been made, the finding or decree must be permitted to stand. Coder v.

204 F.—12

Arts, 152 Fed. 943, 946, 82 C. C. A. 91, 94, 15 L. R. A. (N. S.) 372; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821, 36 L. Ed. 649.

An exhaustive consideration of the record and the briefs relating to the defendant's specifications of error in regard to these findings has failed to convince that through any mistake of fact or error of law the court below has made any finding or reached any conclusion too favorable to the complainant. Turning to the specifications of the complainant, there is convincing evidence that there was a space in the openings out of and directly connected with the excavated stope in the Vesuvius claim which contained 22,168 cubic feet that was not included in the 573,937 cubic feet of excavation on which the finding of the court below is based, and one of complainant's specifications is the exclusion of these 22,168 cubic feet. But because there is persuasive evidence that there was only a small percentage of the material taken from these openings which contained any ore, that these openings were made in the course of the work of developing the ore body and determining its extent, and not in the work of stoping for ore, and that the larger part of the material taken from them was never placed in the stoped cavity, but was taken to the surface and thrown away before the cavity was made, the record fails to prove that the court below made any mistake in this exclusion.

The complainant specifies as error the addition by the court of 31,551 cubic feet of waste material removed from the cavity in 1909 to the 435,350 cubic feet of filled material which the court found in the cavity, on the ground that this added material was removed after the measurement of the filled material on which the court relied had been made, so that this addition gave the defendant credit for it twice. This specification is well founded. The evidence convinces that the court fell into the mistake here charged, and on account of it the amount which the court found the defendant owed the complainant should be increased $23,908.07.

[6] The complainant specifies as error: (1) The allowance by the court to the defendant below of one-half the cost of mining, tramming, and sampling the first-class or shipping ore, and one-half the cost of mining, milling, tramming, and sampling the second-class or milling ore, which amounted in the aggregate to about $117,000.00; and (2) that it failed to charge the defendant with compound interest upon the amount found due. In support of the first specification, its counsel invoke the rule that the measure of damages for the reckless, willful, or intentional taking of ore or timber from the land of another without right is the enhanced value of the ore or timber when it is finally converted to the use of the trespasser, without allowance to him for the labor bestowed or expense incurred in removing and preparing it for market. Wooden-Ware Co. v. United States, 106 U. S. 432, 434, 1 Sup. Ct. 398, 27 L. Ed. 230; United States v. Homestake Min. Co., 117 Fed. 481, 482, 54 C. C. A. 303, 304; Durant Min. Co. v. Percy Consolidated Min. Co., 93 Fed. 166, 167, 35 C. C. A. 252, 254; Resurrection Gold Min. Co. v. Fortune Gold Min. Co., 129 Fed. 668, 679, 64 C. C. A. 180, 191. They argue that this rule is applicable to the

case at bar, and cite in support of their contention Sweeney v. Hanley, 126 Fed. 97, 103, 61 C. C. A. 153, 159; Foster v. Weaver, 118 Pa. 42, 12 Atl. 313, 4 Am. St. Rep. 573; Walker v. Walker, 9 Wall. 743, 757, 19 L. Ed. 814; Railroad Co. v. Soutter, 13 Wall. 517, 519, 520, 523, 524, 20 L. Ed. 543; Blank v. Aronson, 187 Fed. 241, 246, 109 C. C. A. 327, 332; Guckenheimer v. Angevine, 81 N. Y. 394, 396, 397; Goble v. O'Connor, 43 Neb. 49, 61 N. W. 131, 133, 134; Lynch v. Burt, 132 Fed. 417, 67 C. C. A. 305.

These and other authorities have been examined, but they fail to disclose any settled rule of law to the effect that a cotenant, who lawfully extracts the ore from the common property and sells it, is deprived, in his accounting with his cotenant, by his preconceived intent to appropriate all the proceeds thereof to himself, of any allowance for the necessary and reasonable expense of extracting, preparing, and marketing the ore. In Sweeney v. Hanley, 126 Fed. 97, 103, 61 C. C. A. 153, 159, and Foster v. Weaver, 118 Pa. 42, 12 Atl. 313, 4 Am. St. Rep. 573, cotenants who had first fraudulently obtained from their fellows conveyances of their shares of the common property, and thereafter had extracted the mineral from it, were denied an allowance for their labor and expense. The courts held that the complainants were entitled to the enhanced value of their shares of the mineral extracted and sold by the defendants while the complainants were fraudulently dispossessed by them, without any deduction or allowance for the labor and expense of mining or marketing. In those cases the intentional and fraudulent dispossession of the defendants was first effected, and it characterized and rendered unlawful the subsequent acts of the defendants. In the case in hand, however, the intent of the defendant to appropriate all the proceeds of the ore to its own use did not render its entry upon the common property, or its extraction and preparation of the ore for market, unlawful. In this extraction, preparation, and sale it was not a trespasser. It was not acting without right. It was the owner of one half of every particle of the ore in its own right, and of the other half when extracted as trustee for its cotenant. It had the right to extract and sell the ore, in order that it might obtain its share of its value; and if it had accounted for and paid over to its cotenant in due time its part of the proceeds of the sales, no one would be so bold as to claim that it was not entitled to a just allowance for the reasonable expense of mining it, preparing it for the market, and selling it.

[7] In an accounting by a trustee in equity, the basic principle is that the account should be so stated that the trustee shall make no profit from his use of the property of the cestui que trust, and that the latter shall receive the just value of his property and its income. Other equitable rules and principles inform and guide the conscience of the chancellor; but their application to the particular facts of each case is necessarily and wisely left largely to his discretion, to use them in such a manner as to work out the fundamental principle that governs the accounting.

It is conceded that there is convincing evidence in this record that the defendant had the intent, before it extracted any of this ore, to appropriate it all to itself; that it entered secretly, and carefully con-

cealed its extraction and sale of the ore for many years; that it mixed the ore with its own taken from other mines, which it owned in severalty; that it kept no separate account of this ore, or of its proceeds; and that it caved the stope from which it extracted it, so that it was difficult and expensive to ascertain the amount or value of the ore it took. But an evil intent does not make a rightful act wrongful, or an owner of property in its lawful possession a trespasser thereon (Stevenson v. Newman, 13 C. B. 285; 297; Allen v. Flood [1898] App. Cas. 114, 123), or necessarily subject a cotenant who extracts ore from the common property to the measure of damages for a willful trespass. It was a trustee for the complainant of its share of the ore it took, and of the proceeds thereof. As such trustee it violated its duty to notify its cotenant of its entry and taking of the ore, its duty to keep the ore separate, its duty to keep an account of it and of its proceeds, and its duty promptly to account for and pay to its cotenant its just share of the proceeds of the ore. Nevertheless, when this matter came to an accounting in the court below, the duty still rested upon the chancellor so to apply the rules and principles of equity jurisprudence to this accounting that the complainant should receive its just share of the value of the ore, or of its proceeds, and the defendant should make no profit by its breaches of trust.

The general and just rule is that a cotenant, in exclusive possession of mining property, who extracts and sells the ore, may charge against its proceeds the reasonable and necessary expense of its extraction and marketing. Lindley on Mines, § 790, p. 990; Appeal of Fulmer, 128 Pa. 24, 18 Atl. 493, 15 Am. St. Rep. 662. The chancellor below was of the opinion that the application of this rule to the accounting in this case would yield a just and equitable result, and our review of the evidence and the arguments has led to the same conclusion. There was neither error nor mistake in allowing to the defendant the reasonable expense of mining, tramming, milling, and sampling the ore.

[8] Did the court err by its refusal to allow compound interest? Compound interest is generally allowed to give effect to the equitable rule that a trustee may not derive profit from the property of the cestui que trust, and that the latter should receive the full value of his property and its income. Walker v. Walker, 9 Wall. 743, 757, 19 L. Ed. 814; Heath v. Waters, 40 Mich. 457, 472; Schieffelin v. Stewart, 1 Johns. Ch. 620, 627, 7 Am. Dec. 507. The defendant stood in a fiduciary relation to its cotenant. It held the complainant's share of the ore and its proceeds in trust for it. It violated its duty to keep an account of the ore and its proceeds, to keep the ore separate from other ores it mined, to account for and promptly pay over to the defendant its share of the proceeds of the ore, and to inform the defendant of its acts and omissions. But if the payment of the amount adjudged will deprive the defendant of all profit from the complainant's share of the ore, and will yield to the complainant the full value of its share and of the interest or income therefrom that it would probably have derived if the defendant had not extracted the ore, the reason for the allowance of compound interest does not exist.

The defendant took this ore from the mine between 1902 and May, 1908. It extracted the larger part of it between 1904 and 1908. The

testimony fails to disclose the amount taken each month, or each year, and the court below fixed January 1, 1906, as the mean time when the entire debt of the defendant for the complainant's share of the proceeds of all the ore should be deemed due, and charged it with interest thereon from that date at 8 per cent. per annum. The evidence left the value of the ore uncertain. For the first-class ore the court charged the defendant with the highest monthly price it had received for ore of that class during the extraction of this ore, and it stated its account by the rule that the defendant should be made to bear the burden of any uncertainty in the proof due to its fault. This was the state of the case when the request for compound interest was considered, and the chancellor said that the lawful rate of interest to be allowed by the decree, 8 per cent. per annum, was above the current rate, that the method of calculation of the amount adjudged due had been sufficiently unfavorable to the defendant, and refused to grant the request. The evidence in this case is so persuasive in support of many of the findings of the court on the material issues of fact, and so conflicting and uncertain upon the others, that the record fails to convince that the amount adjudged due, with interest at 8 per cent. per annum, will not yield to the complainant the full value of its share of the ore extracted, and of the income that it probably would have derived from it, if the extraction had not been made, or that it will not deprive the defendant of all profit therefrom. There is no rule of law which requires the allowance of compound interest under such circumstances, and no mistake of fact or error of law is discovered in the refusal to charge it.

There are many specifications of error of each of the parties to this suit which have not been discussed in this opinion, but there is none which has not received examination and reflection. This is a suit in equity, and the consideration and decision of the questions this appeal presents is a trial of this case de novo. Upon a review of the entire case, the conclusion of this court is that the decree below, modified by the correction of the slight mistake which has been noted, is well sustained by the evidence, reasonable, and just.

Let the case, therefore, be remanded to the court below, with directions to modify the decree by increasing the amount of the adjudged recovery by $34,034.46, which is the sum of $23,908.07 and interest thereon from January 1, 1906, to April 17, 1911, and let the decree, so modified, be affirmed.