R. L. WHITE ET AL V. JOE G. SMYTH ET AL.

No. A-1347. Decided October 13, 1948.
Rehearing overruled December 15, 1948.
(214 S. W., 2d Series, 967.)

274

*Critz, Kuykendall, Bauknight, Mann & Stevenson, Black & Stayton* and *John W. Stayton*, all of Austin; *Denman, Franklin & Denman, L. D. Hill, T. M. West* and *John A. Bitter, Jr.*, all of San Antonio, for petitioners, R. L. White et al.

The trial court erred in entering a judgment for respondents for eight-ninths of the net profits realized by petitioners from his asphalt business, and the court of civil appeals erred in affirming that judgment, because if said respondents were entitled to any money judgment, which petitioners deny, it should have been for eight-ninths of the value of the rock asphalt in the ground. The trial court also erred in holding that the entire asphalt estate owned in common by petitioners and respondents to be sold and the proceeds distributed among the owners thereof. The judgment should have set apart to petitioner in kind his one-ninth interest in the rock asphalt estate in all the property involved. McGowan v. Bailey, 179 Pa. 470, 36 Atl.

325; DeWitz v. Saner-Whiteman Lumber Co., 155 S. W. 980; Bender v. Brooks, 103 Texas 329, 127 S. W. 168; Henderson v. Chesley, 116 Texas 355, 292 S. W. 156.

*Carl Wright Johnson,* of San Antonio, *Ross Doughty, Jr.,* and *David R. White,* both of Uvalde, for Joe G. Smyth, *Suttle & Kessler* and *D. W. Suttle,* all of Uvalde, for Andrew F. Smyth; *Simmons, Smyth & Much, Murray G. Smyth* and *Fred Much,* all of Houston, for Lewis M. Smyth, respondents.

In reply to the contentions of petitions cited: Newman v. Newman, 27 Grattan (Va.) 714; Tuggle v. Davis, 292 Ky. 27, 165 S. W. (2d) 844: Burnham v. Hardy Oil Co., 147 S. W. 330.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

We follow the Court of Civil Appeals in adopting the statement of the nature and result of the suit as made by White et al., appellants in that court. It is:

"This suit was filed in the District Court of Uvalde County, Texas, by Joe G. Smyth et al, hereinafter called appellees, against R. L. White et al, hereinafter called appellants, and against Lewis M. Smyth et al, who assumed the position of plaintiffs below and who are hereinafter referred to as appellees. Appellees alleged that they and the appellants owned the fee simple estate (including all rock asphalt) in and to a certain 200 acre tract of land in Uvalde County; that the same parties owned all the rock asphalt estate in and under approximately 30,000 acres of land which is mostly in Uvalde County but is partly in Zavala County; that appellants R. L. White and White's Uvalde Mines had removed a large quantity of rock asphalt from the property owned in common and had failed to account to appellees for their portion of such rock asphalt. Appellees prayed that the 200 acre tract, including the rock asphalt estate thereon, and the rock asphalt estate in the 30,000 acres, be found to be incapable of partition in kind and that the same be ordered sold and the proceeds divided among the owners thereof; and that the appellants R. L. White and White's Uvalde Mines be required to account to appellees for the rock asphalt removed from the common property and that appellees have judgment against said appellants for any sums that such accounting showed to be due appellees.

"It is undisputed that appellants own an undivided one-ninth interest in the 200 acre tract and in the rock asphalt estate in the tract of approximately 30,000 acres.

"The case was tried before a jury; and in answer to special issues the jury found that the rock asphalt estate in the land in question cannot be partitioned in kind; that the reasonable value in the ground of the 397,338.11 tons of rock asphalt mined by applelants during the period of time involved in this controversy, that is from October 29, 1942, to September 30, 1945, was $99,334.53; that the net profit realized by appellants from the conduct of their rock asphalt business during this period of time was $250,180.56; that appellants' mining operations during the same period were not of such nature as to exclude the other owners of rock asphalt (appellees) from mining; and that appellants had not during the period in question 'mined more than one-ninth in value in the ground of the rock asphalt minable from all of the rock asphalt involved in this suit.'

"The trial court entered a decree reciting that the tract of 200 acres, including the rock asphalt estate therein, and the rock asphalt estate in the tract of approximately 30,000 acres, cannot be partitioned in kind. The decree ordered the common property sold and the proceeds distributed among the owners thereof, and awarded appellees a judgment against appellants R. L. White and White's Uvalde Mines in the sum of $222,382-.72 (this being eight-ninths of the net profits realized by appellants from their asphalt business) with interest thereon at six per cent per annum until paid."

The Court of Civil Appeals, in a thorough opinion, affirmed the judgment of the trial court. 214 S. W. (2d) 953. In this opinion petitioners will be referred to as petitioner or White, since petitioner R. L. White is the active partner and principal owner of White's Uvalde Mines.

The 30,000 acres of land, including the 200 acre tract, known as the Smyth ranch, was the community property of J. G. Smyth and his second wife, Mrs. Espie Belle Smyth. On the death of J. G. Smyth, his one-half interest passed in undivided interests to his nine children, two of whom, Mrs. T. M. West and Mrs. R. L. White, wife of petitioner White were J. G. Smyth's daughters by his first wife. On September 14, 1923, Mrs. Espie Belle Smyth and the devisees of her deceased husband, except Mrs. R. L. White, executed a lease of the ranch to petitioner White for mining, producing and marketing rock asphalt from the land, the lease providing for the payment to lessors of twenty-five, twenty, and fifteen cents per ton for the rock asphalt sold or taken. The term of the lease is ninety-nine years, but the lessee is given the right to terminate the lease by the execution

of a written release and the payment of $1,000.00, with the further sum of $13,222.22 which shall be compensation for 56,000 tons of rock asphalt not then paid for, and the lessee is permitted thereafter to remove from the land all machinery, tools, houses and improvements belonging to him and the rock asphalt for which payment has been made, including the 56,000 tons. The interest of Mrs. Espie Belle Smyth in the lands thereafter passed under her will to respondents, so that respondents became the owners in undivided interests of the entire title except the one-eighteenth interest owned by Mrs. White and the one-eighteenth interest owned by Mrs. West.

Petitioner White entered upon the premises a short time after the execution of the lease and operated under the lease continuously until October 30, 1941. In the year 1932 the owners of the ranch, including Mrs. R. L. White, the wife of petitioner White, both by deeds and by decree in a suit for partition, effected a partition of the land by which specific tracts were set apart to those who had owned the same in undivided interests, except that the 200 acre tract in Survey 122, upon which a mine was being operated by White, and the rock asphalt in all the lands were excluded from the partition and continued to be owned in undivided interests. The partition decree and some of the pleadings recited that the 200 acre tract and the rock aspalt in the other land were then under rock asphalt mining leases, and further that they were not capable of or subject to equitable partition.

On October 30, 1941, White exercised the right to terminate the lease by executing a release and filing it for record, and by depositing to the credit of the lessors, respondents, $14,222.22. He notified respondents of his action and advised them that when he had mined the rock for which he had prepaid he would vacate the property.

On October 8, 1942, White acquired by conveyances the undivided one-eighteenth interest of Mrs. T. M. West and the undivided one-eighteenth interest of Mrs. White in the 200 acre tract and in the rock asphalt in all of the lands in the ranch; and on November 13, 1942, he notified respondents by letter that he had finished removing his prepaid rock and further that, having acquired the one-ninth interest from his wife and Mrs. West, he would "now want to take out such part of my share of the rock as is practical before I move my machinery". The letter further stated that he recognized "the right of all other interest-

ed parties to do likewise" and that he would keep an accurate aaccount of all that he removed. The position thus taken by White and his continued mining and removal of the rock asphalt after he had terminated the lease and after he had taken all the prepaid rock asphalt caused the institution of this suit.

The application for writ of error presents under several points three principal contentions: First, that petitioner White owes no duty to account to respondents, because he has not taken more than his fair share of the rock asphalt in place, has not excluded respondents from the premises, and in mining has made merely normal use of the property, it having already been devoted to the mining of rock asphalt at the time petitioner acquired his undivided interest therein; second, that if he owes a duty to account, he is liable only for eight-ninths of the value in the ground of the rock asphalt he has mined and not for profits which he has realized; and third, that the jury's findings that the rock asphalt in certain surveys in the ranch and in all of the property outside of certain surveys cannot be equitably partitioned in kind are without evidence to support them. We consider first the points pertaining to partition, since the question whether the property is or is not capable of partition in kind has an important bearing upon the other questions.

The record contains many pages of testimony as to the nature, location, quantity and quality of the rock asphalt in the lands. The evidence shows that the rock asphalt, which is mined and used for constructing roads and streets, consists of porous limestone impregnated with asphalt or bitumen. The limestone generally lies in strata of varying depth and thickness. The depth of the overburden varies even in short distances and in places is so great that the rock asphalt beneath it cannot be profitably mined. Sometimes shale, which has to be thrown away, is found down in the rock asphalt and the thickness of the shale varies from one inch to thirty feet. Generally when the rock is very porous, it is richer in asphalt, which fills the pores, but sometimes there is a smaller quantity of asphalt so that it fills the pores only in part. The rock asphalt has richer strata and leaner strata, and its bitumen content is different from place to place.

Briefly stated, the process by which the rock asphalt has been mined by White and made ready for market is as follows: The rock asphalt is blasted off from the mine or quarry, loaded by shovels into trucks and taken to the crusher, some rich rock being taken and some lean rock in order that the specification may be attained by mixing it. After the rock is crushed it is

screened into bins, then carried to a mixer, where the ground asphalt rock is mixed with oil and then with water. The mixture is then dropped into the car, ready for shipment.

■ Since 1917 the statute has expressly authorized any joint owner of "any mineral, coal, petroleum or gas lands, whether held in fee or by lease or otherwise" to compel a partition thereof between the other joint owners. Article 6082, R. C. S. of 1925. As a part of the procedure, Rule 770 provides that "should the court be of the opinion that a fair and equitable division of the real estate, or any part thereof, cannot be made, it shall order a sale of so much as is incapable of partition," and the proceeds shall be partitioned among the parties according to their respective interests. On the trial of the case the court, after appropriate instructions, including a definition of the words "partition in kind" submitted to the jury sixteen special issues inquiring whether the rock asphalt estate in certain designated parts of the lands and the rock asphalt in all of the lands involved in the suit can be fairly and equitably partitioned in kind. Petitioners made no objection to any of the issues submitting these questions or to any of the instructions accompanying the issues. The jury was instructed to answer each of the issues "it can" or "it cannot"; and each issue was answered by the jury "it cannot".

The first ten of the issues relate to the partition of the rock asphalt estate in the south one-half of Section 122 and in the portions of Sections 133 and 215 designated as lots 1 to 9 in each section. Petitioner contends that the undisputed evidence shows that his interest in the rock asphalt estate in this part of the land can be fairly and equitably partitioned to him in kind, and that the jury's findings to the contrary are not supported by any evidence. The Court of Civil Appeals concluded that these findings are supported by evidence, and further that they are made upon sufficient evidence.

In addition to evidence proving the facts stated generally above as to the nature, location and variable quantity and quality of the rock asphalt in place, the record contains many pages of testimony about exploration, investigation and testing for the purpose of ascertaining the location, quantity and quality of the rock asphalt in the land. Many core wells were drilled, most of them in the surveys near the mine operated by White. The cores were tested and expert witnesses testified to their conclusions from examination and tests of the cores. White testified that he had caused many core wells to be drilled on the

Smyth ranch and that he had drilled from one hundred ten or one hundred fifteen core holes after this suit was filed and in preparation for its trial.

Porch and Spice, experienced geologists employed by petitioner, undertook to determine the tonnage of the rock asphalt in the south half of Survey 122 and in parts of Surveys 133 and 215. This they based upon information revealed by cores taken from test holes drilled into the rock asphalt and from a study of surface conditions. Core wells were drilled first to fill in the gaps in drilling theretofore done in Survey 122, and they then proceeded to drill test holes in Surveys 133 and 215. On the south line of Survey 122 they drilled the holes one thousand feet apart, but they changed and continued drilling the holes in Surveys 133 and 215 one-fourth of a mile apart. From the information thus obtained they constructed cross sections and calculated the tonnage of the rock asphalt in place. They then divided the south half of Survey 122 into nine subdivisions or lots, each of which according to their estimates, contain the same tonnage of rock asphalt. They made like divisions into nine lots of a part of Section 133 and a part of Section 215, and prepared a map showing these subdivisions and their calculations. They testified that their estimates as to the tonnage of rock asphalt in the nine lots of Survey 122 were accurate within ten per cent limit of error, and that the estimates as to the tonnage in the lots in Surveys 133 and 215 were accurate within a twenty-five per cent limit of error, the test wells in those sections being farther apart. Petitioner White testified that he would be willing to accept any one of the nine subdivisions of the south half of Survey 122 and any one of the nine subdivisions of Survey 133 and any one of the nine subdivisions in Survey 215, permitting respondents to make the selection for him.

Getzendaner, a geologist, testified for respondents, after having made a study of the rock asphalt on the Smyth ranch since November, 1943, and after having examined the cores from the test holes drilled by both parties and the logs that were introduced in evidence. He was examined at great length about the test wells and the cores, and he expressed the opinion that with the information available, the rock asphalt in the south half of Survey 122 could not be divided by a surface survey into nine parts of equal tonnage or into parts of equal value in bitumen content or in the volume of overburden, and he expressed the same opinon as to a division of the part of Survey 133 and as to a division of the part of Survey 215. He testified that the

error in estimates of the volume of the rock asphalt in the south half of Survey 122 would be very apt to exceed twenty-five per cent, and that the error in the estimates of the tonnage in Survey 133 might be fifty per cent or even more, and he said further: "The volume of rock asphalt can be estimated more accurately than the economic asphalt."

In addition to the opinions expressed by Getzendaner, the record contains many pages of testimony as to conditions and facts which reasonably support the jury's findings that the rock asphalt estate in the south one-half of Survey 122 and in the parts of Surveys 133 and 215 are incapable of a fair partition in kind, either by the method used by Porch and Spice or otherwise. Some of these will be briefly mentioned. The existence of rock asphalt and its depth vary from place to place. One may drill at one place and find it and then move fifty or seventy-five feet and find none. It may be found at one depth and seventy-five or one hundred feet away it will at a greater depth or not there at all. Some rock asphalt strata are thicker than others and at places the increase in thickness is abrupt. The bitumen content of rock asphalt is most important. Rock asphalt varies as to bitumen content both horizontally and vertically, and it varies in very short distances, there being no general rule about it. Despit these facts. it is shown by the cross examination of the witness Spice that he and Porch, in making their proposed partition of some of the land into nine parts, made no adjustments in their estimates for variables that might exist in the bitumen content of the rock, did not take the bitumen content into account. The thickness of the overburden has an important bearing on the value of rock asphalt, the cost of mining increasing with the depth of the overburden, which varies greatly from place to place. Sometimes shale is found. If present above a certain percentage it destroys the marketability of the rock asphalt. Much water is required for operating a rock asphalt plant. It is found at different depths on the Smyth ranch. At some places it maybe obtained from creeks by impounding it with dams.

The parties seem to be in agreement that the most satisfactory method for determining the location, quantity and quality of rock asphalt in place is by drilling core wells and examining and testing the cores. White testified that if he were going to open a pit to mine rock asphalt he would try to drill the core wells one hundred feet apart. According to the testimony of Laird, a witness for respondents, rock asphalt under the ground cannot be calculated with any reasonable degree of accuracy as

to the tonnage without very close core drilling. He thought the holes for the purpose of comparing one place with another ought to be within twenty-five or thirty-five feet apart. White estimated the cost of coring to be about $2.00 a foot. Joe G. Smyth calculated that the cost of core drilling one section of land, with the holes two hundred feet in depth and one hundred feet apart at $2.00 per foot, would be $1,115,136.00.

■ There are other factors shown by the evidence which, like those mentioned, tend to prove that without prohibitive cost it is impossible to make a fair and eqitable division of the rock asphalt in kind, but it is believed that the evidence which has been stated is at least sufficient to raise issues of fact and to support the answers of the jury to the questions as to partition in kind. In our opinion the facts in evidence and the jury's findings bring the case well within the general rule that known mineral lands, because of elements of uncertainty, not resolvable at reasonable cost, are not susceptible of fair division by metes and bounds, and to avoid unfair division should be partitioned by sale and distribution of the proceeds. Sheffield Coal & Oil Co. v. Alabama Fuel & Oil Co., 185 Ala. 50, 51, 64 So. 67; Musgrove v. Aldridge, 205 Ala. 189, 87 So. 803; Napier v. Napier, 233 Ky. 304, 25 S. W. (2d) 735; Summers' Oil and Gas, Vol. 3, p. 235, Sec. 536; Lindley on Mines (3rd Ed.) Vol. 3, pp. 1952-1954, Sec. 792; 36 Am. Jur., p. 421, Sec. 205; 40 Am. Jur. p. 74, 83; Note 143 A. L. R. pp. 1092, 1102-1104.

Relying upon Henderson v. Chesley, 273 S. W. 299 (application for writ of.error refused, 116 Texas 355, 292 S. W. 156) petitioner takes the position that the rock asphalt estate in the lands of the ranch, outside of Surveys 120, 122, 133, 214 and 215, should be partitioned in kind. He insists that there is no evidence whatsoever as to the quantity or quality of rock asphalt underlying those lands, and that accordingly it must be presumed that the rock asphalt underlying every acre of the same is equivalent in value to the rock asphalt underlying every other acre thereof.

Henderson v. Chesley was a suit between joint owneres for the partition of the minerals in a 1107 acre tract of land. The opinion of the Court of Civil Appeals states that the land had never been explored for coal, oil or other minerals; that it was not certainly known whether any minerals existed in or under the land; and that it could not be determined in what part of the and minerals existed or in what way they were distributed in

and under the land. The trial court decreed a partition in kind, that is, by dividing the surface. There had been no exporation. It was not known whether the land contained or did not contain minerals of value. The Court of Civil Appeals, in affirming the trial court's judgment, assumed for the purpose of partition that each acre of land contained an equal amount of minerals. It reasoned that this assumption "is exactly what is done when the fee is partitioned between joint owners, for a partition of the fee carries with it as an incident of title in fee a partion of any mineral interest not theretofore severed from the fee"; and that "if it is fair to assume in that character of partition that each acre contains 'a like amount of minerals, then no good reason exists why the same assumption should not be indulged in a partition of the undeveloped mineral rights in land."

The instant case is not ruled by that case, because the decision of that case was based wholly upon the assumption made by the court without any evidence whatever as to the mineral character of the land, whereas in this case there is evidence as to the mineral character of the lands of the ranch outside of Surveys 120, 122, 133, 214 and 215, and there is evidence which tends to prove that the rock asphalt in those lands is not capable of fair and equitable partition in kind. Part of the evidence consists of admissions made by petitioner White. His answer in trial court in this case contains the following allegations: That the title to "all of said property" descended from J. G. Smyth and that during his lifetime the rock asphalt was discovered "on said premises" and the rock asphalt strata opened and mined and by him devoted to mining purposes; that by virtue of the previous devotion of said property to mining after the termination of the lease the property was valueless and useless except for mining purposes; and that there are vast quantities of rock asphalt in the deposits on the lands, and in the one section on which the mining is being conducted there are approximately one hundred million tons.

When the Smyth ranch was partitioned in 1932 White was mining the property for rock asphalt, having engaged in mining it since he leased it in 1923. He had drilled many core holes and had mined at three different places on the ranch. White's wife and her sister owned undivided interests in the ranch and they and White were parties to the partition suit. The petition in that case alleges that in and under portions of the lands there are deposits of rock asphalt, the extent, quantity and quality of which are unknown or only partly known; that such information could not be obtained except by core drilling and other investigation which would entail great expense, and that known

deposits and present information indicate rather conclusively that the deposits are of varying qualities and quantities without any uniformity of location either as to area or depth, so that an equitable partition of the rock asphalt is impossible. The petition further alleges that the rock asphalt is not capable of equitable partition and prays that the rock asphalt in all of the lands and the two hundred acres of Section 122 occupied by the mine be excepted from the partition and reserved to the co-owners to be owned by them jointly. The answer filed in that suit by Mrs. West and Mrs. White, joined by her husband, petitioner herein, alleges that the said defendants are in accord with the allegations of fact and the procedure outlined in the plaintiffs' petition. The decree of partition in that case contains the court's findings that the rock asphalt in the lands and the two hundred acre tract are not capable of equitable partition, and that all of the parties have so agreed, both in their pleadings and in open court. The decree partitioned the surface, except the two hundred acre tract, among the cotenants, but excepted the rock asphalt from the partition.

There is testimony, including that of White, that outside of the surveys where most of the tests have been made there are in the part of the pasture west of Turkey Creek, which runs through the ranch, some twelve thousand to fifteen thousand acres of rock asphalt bearing land; that there is an "awful lot" of rock asphalt there; that there is rock asphalt on the bed of Turkey Creek from end to end and in the bed of Gato Creek and sometimes in the hills; and that in going over the ranch and digging wells on it one finds rock asphalt in various places.

Much of the testimony directed primarily to the survey where most of the tests were made relates as well to the ranch generally. This is the testimony which has been discussed as to the nature, location and variable quantity and quality of rock asphalt in places, the variables in thickness of the strata, in bitumen content and in the depth of the overburden and the lack of uniformity and continuity in the deposits, making it difficult and even impossible, with any reasonable degree of accuracy and without prohibitive cost, to determine the extent and value of rock asphalt in place and to make a fair division of it by metes and bounds.

It is our opinion that by reason of the foregoing facts, other evidence in the record, and the jury's verdict, the rock asphalt estate in the ranch should be regarded as known mineral land, and that the trial court correctly directed its sale and the distribution of the proceeds instead of undertaking to divide it by

lines drawn on the surface. There is no reason for assuming, as was done in the Henderson-Chesley case, where there was no evidence as to the existence of minerals, that each acre of the land contains an equal amount of minerals. Neither presumption nor assumption that contradicts the evidence is to be indulged.

■ The amount of the trial court's judgment in favor of respondents against petitioner represents eight-ninths of the net profits realized by petitioner from mining, processing and selling 397,381.11 tons of rock asphalt taken from the land during the period from October 29, 1942, to September 30, 1945. This amount of net profits was found by the jury after deducing from the gross proceeds all expenses incurred by petitioner, together with a reasonable compensation for his personal services and the reasonable value of the use of his plant and other property in the operation of the mine. The judgment follows the weight of authority and the general rule thus stated in American Jurisprudence: "Since any co-owner of a mine or mineral property is at liberty to work it, some courts have intimated that a co-owner who does not choose to avail himself of this right should have no claim upon the production of one who has elected to do so. But this view seems to be contrary to the weight of authority, and the prevailing rule appears to be that the producer must account to his cotenant for all profits made to the extent of his interest in the property". 14 Am. Jur., p. 104, Sec. 36. See also Kahn v. Central Smelting Co., 102 U. S. 641, 26 L. Ed. 266; Silver King Coalition Mining Co. v. Silver King Consol. Mining Co. (8th Circuit) 204 Fed. 166; Grant v. Pilgrim (9th Circuit) 95 Fed. (2d) 562; Campbell v. Homer Ore Co. 309 Mich. 693, 16 N. W. (2d) 125; Newman v. Newman, 27 Gratt. (Va.) 714; Barnum v. Landon, 25 Conn. 137; Cosgriff v. Dewey (Sup. Ct. N. Y.) 47 N. Y. S. 255 (affirmed 164 N. Y. 1, 58 N. E. 1) ; 79 Am. St. Rep. 620; Note Ann. Cas. 1918 B, pp. 583, 586.

It seems that there are no decisions in this state as to the duty of a co-owner who takes solid minerals from the property to account to his cotenant. It is held, however, as in most of the other states, that one who takes oil without the consent of his cotenants must account to them for their share of the proceeds of the oil less the necessary and reasonable cost of producing and marketing it. Burnham v. Hardy Oil Co., 147 S. W. 330, 334-335 (affirmed in 108 Texas 555, 195 S. W. 1139) ; Broadway v. Stone (Com. App.) 15 S. W. (2d) 230; Davis v. Atlantic Oil Producing Co. (5th Circuit) 87 Fed. (2d) 75; Erp. v. Mid-

Continent Petroleum Corp. 167 Okla. 86, 27 Pac. (2d) 855, 91 A. L. R. p. 188 and Note, p. 205 and fol.; Summers' Oil and Gas, Vol. 1, p. 97, Sec. 37, p. 108, Sec. 38.

Petitioner contends that the rule above stated does not apply to this case, and that he need not account to his cotenants, because he has mined no more than his fair share of the rock asphalt in place and has not excluded them from the premises. He relies primarily upon Kirby Lumber Co. v. Temple Lumber Co., 125 Texas 284, 83 S. W. (2d)˙ 638, and the text of Lindley (Lindley on Mines, 3rd Ed., Vol. 3, Secs. 789-789a, pp. 1933-1941) for what he insists is the applicable rule.

In the Kirby Lumber Company case the Temple Company owned an undivided two-thirds interest and the Kirby Company owned an undivided one-third interest in a 640 acre tract of land on which there was valuable standing timber. The Temple Company, believing that it owned the entire title to a specific 427 acres of the land, cut all of the timber standing on that tract, amounting to ten million feet, and manufactured it into lumber. There remained uncut on the 640 acres 2,783,325 feet of timber. The court's opinion states that the 640 acres was generally of uniform value as to timber and otherwise. The Kirby Company sued the Temple Company to recover the manufactured value of one-third of the timber that had been cut. The trial court found that the total amount of timber standing on the land before the cutting was 12,783,325 feet, of which the Kirby Company's one-third amounted to 4,261,108 feet, and that the amount left standing was 2,783,325 feet, which was treated as belonging to the Kirby Company, and that thus the Temple Company had cut 1,477,783 feet more than its share. Its judgment awarded to the Kirby Company $43,372.93, being the manufactured value of the 1,477,783 feet. The Court of Civil Appeals reversed and rendered the trial court's judgment, after holding that the Kirby Company was charged with notice that its predecessor in title had cut timber from part of the land. 42 S. W. (2d) 1070. The Supreme Court reversed the judgments of the two lower courts and rendered judgment in favor of the Kirby Company against the Temple Company for the stumpage value, $5.00 per thousand feet, of the 1,477,783 feet of excess timber cut by the Temple Company. Most of the Court's opinion is devoted to a discussion of the question whether the Kirby Company should be charged with notice that timber had been cut by its predecessor in title and of the question as to the amount of the recovery, that is whether stumpage value or manufactured value. Little is said in the approval of that part

of the trial court's judgment which charged the Temple Company with only the amount of the timber cut in excess of its share. The authorities there cited relate to timber and to the question whether stumpage value or manufacture value may be recovered.

The important distinction between the Kirby Lumber Company case and the instant case, in respect to the ruling that the Temple Company need not account for the timber cut not in excess of its two-thirds share, is that in that case, as shown by the Court's statement that "the 640 acres was generally of uniform value as to timber and otherwise", the timber was fairly subject to partition in kind, whereas in the instant case the rock asphalt is not. The Temple Company's action in cutting the timber up to its share and the Court's approval of that action by the judgment rendered worked in effect a partition of the timber. Here there has not been, and there could not be consistently with the finding that the rock asphalt is not capable of partition in kind, an approval by the court of White's action in taking for himself and disposing of a part of the rock asphalt. The ownership of all of the cotenants extends to all of the rock asphalt, and White was not authorized to make partition of it. We approve the conclusion on this point thus well expressed by Associate Justice Norvell, writing the opinion of the Court of Civil Appeals in this case:

"On the other hand, if the mineral estate be not partitionable in kind, it follows that although a cotenant may be entitled to partition, he is not entitled to a partition in kind, consequently, his taking of minerals prior to partition can not be regarded as vesting absolute title of the severed minerals in the taker. On the contrary, the title to the severed minerals remains in all the cotenants in their proportionate interests. The minerals not being partitionable in kind, the substantive right of cotenants desiring division or partition is the right to have the estate or minerals sold and the proceeds thereof divided. It follows, therefore, that the title of the nonoperating cotenants in and to the extracted minerals does not terminate until said minerals are disposed of by sale, or until they are brought to a place or point where there exists an established market value for such minerals. His rights thereupon attach to the proceeds."

■ The facts of this case attest the obvious soundness of the rule that a cotenant cannot select and take for himself part of the property jointly owned and thus make partition. While he was lessee under the lease that covered the entire ranch, White

selected the site for and developed the present pit, making extensive improvements, including the construction of roads, excavations and grading for private tracks, other excavations and grading, all at great cost and of very substantial value. The location of the plant site was favorable and valuable. The rock asphalt in the pit was both rich rock and lean rock, both of which were necessary to meet market demands and specifications. The east wall of the pit, which was rock asphalt, attained a height of about eighty feet. It was rich in asphalt at the top and lean at the bottom. From this wall much of the rock asphalt for which accounting is sought in this suit was mined and mixed by the simple process of blasting the rock from the face of the wall, so blasting it as to mix the rich rock with the lean rock. When White completed the mining of his prepaid rock the piled overburden was about two hundred feet east of the east wall of the pit, and he was able to mine the rock asphalt from the wall without moving more than the natural overburden, but at the time of the trial he had mined so far east that the toe of the piled overburden was reached and the overburden would have to be removed in order to mine farther east.

When White exercised the right to terminate the lease and completed the taking of his prepaid rock he had no further right or interest in the rock asphalt in the lands, the mine or the mine site, except that he was given by the lease the right to remove his machinery, tools, houses and implements. The rock asphalt estate in all of the lands belonged to all of the cotenants, as did also the added advantages and values to the entire mineral estate created and existing by reason of the developed pit and mine site; but White, taking advantage for himself of the added values, after acquiring the one-ninth interest of his wife and his wife's sister, mined from the pit about four hundred thousand tons of the rich, valuable and readily accessible rock asphalt.

It is true, as contended by petitioner, that in some of the cases cited above which require the producing tenant to account to his cotenants for their share of the profits, it does not affirmatively appear that the mining cotenant has not taken more than his share. In those cases the point made by petitioner seems not to have been made, and the rule is stated and applied that the producer must account, with no reference to the question whether he has taken more or has taken less than his share. In several of the cases, however, the point was made and rejected. In Campbell v. Homer Ore Co., 309 Mich. 693, 16 N. W. (2d) 125, the defendant claimed tht as long as the plaintiff's

share of the ore was not removed but was still left, it was not liable to the plaintiff. The court, in rejecting the contention, referred to the fact that the iron ore in its natural situation was not capable of precise determination as to either quality or amount, and said further: "The tenant in common who takes possession is not vested with any superior right to choose what ore is to him most convenient to mine, select what is more profitable and remove and sell without accounting". In overruling the defendants' contention in Barnum v. Langdon, 25 Conn. 137, 150, that the plaintiffs could not call upon them to account without proving that they had taken more than their share, the courts said: "The error of the defendants lies in this; they contend they own absolutely whatever they get out of the ore pit if it is not too much, whereas they own only one-twenty-fourth part of what they get out, and must account at reasonable times, for the other twenty-three parts, to the plaintiffs". It was held in Cosgriff v. Dewey, 21 App. Div. 129, 47 N. Y. S. 255, affirmed 164 N. Y. 1, 58 N. E. 1, 79 Am. St. Rep. 620, that the tenant who quarried and removed rock from the premises was liable to account to his cotenant for his damages and the profits of the transaction, and that he could not vail himself of the fact that the rock was practically inexhaustible, or that his acts had added value to the property as a whole.

Petitioner relies also upon Mr. Lindley's text in which the conclusion is expressed that, since cotenants are the owners of the substance of the estate, one of them may work a mine without accounting to his cotenants, even though it may consume the whole of the value of the estate, provided he does not exclude his cotenants. The reason for this conclusion is thus stated: "The taking of ore from the mine is rather the use than the destruction of the estate within the meaning of the general rule. The result of the tenant's labor and capital are in the nature of proceeds or profits, the partial exhaustion being but incidental consequence of the use. The same principle applies to the extraction of oil and gas." Lindley on Mines (3rd Ed.) Vol. 3, pp. 1933-1938, Secs. 789-789a. A number of cases are cited in support of the conclusion, none of them being a mining case except McCord v. Oakland Q. M. Co., 64 Cal. 134, 27 Pac. 863, 49 Am. Rep. 686. That was a suit for treble damages under a statute providing that a cotenant who commits waste is liable in treble damages to any person aggrieved thereby. It was held that there could be no recovery because the tenant who took minerals from the jointly owned property and had not excluded his cotenants was not guilty of waste. The opinion intimates, however, that had the plaintiffs sued for an accounting, the de-

fendant would have been required to account, because the effect of the exclusive working by one may be to exhaust the mineral, and the uncertainty of the prospective value of the property may render it impossible to make a just partition of it.

The rule announced by Mr. Lindley is an extension to co-tenants of the common law rule applied to life tenants who operate mines already opened on the property. It rests upon somewhat technical and artificial views of normal use and waste, and is unrealistic in treating the exhaustion of a mineral estate as but an incidental consequence of use. It disregards the important fact that each cotenant's interest extends to all of the minerals. Its full application would permit a cotenant to take all of the minerals without being required to account. And, as has been shown, it is contrary to the weight of authority.

Kirby Lumber Co. v. Temple Lumber Co., 125 Texas 284, 83 S. W. (2d) 638, is cited by petitioner to sustain his assignment of error that if he owes respondents the duty to account, he must account only for the value in the ground of the rock asphalt mined by him. That case is not an authority for this point. The plaintiff did not ask for an accounting for profits. There were no allegations as to profits and no issue as to profits was submitted. There is nothing to show that any profits were made. The question before the court was whether the defendant should be required to pay for the stumpage value of the timber cut or for its value after having been manufactured into lumber and without deduction for expenditures. The court held that the former, that is stumpage value, was the measure of recovery because the defendant had acted in good faith, believing that it owned all of the timber that it had cut. A fundamental difference between the facts of the Kirby case and the instant case, which has been noted herein, has an important bearing here. It is that in the Kirby case the standing timber was of uniform value and could readily be partitioned in kind, whereas in this case the rock asphalt cannot be fairly and equitably partitioned in kind.

Three cases are cited by petitioner in which the cotenant who had taken minerals was charged with their value in place: Appeal of Fulmer, 128 Pa. 24, 18 Atl. 49, 15 Am. St. Rep. 662; McGowan v. Bailey, 179 Pa. 470, 36 Atl. 325; and Clowser v. Joplin (W. D. Mo.) 4 Dill. 469n, Fed. Cas. No. 2908a. While the opinions in the two Pennsylvania cases contain reasoning to justify the use of that measure, they also indicate that it

was deemed just and equitable under the peculiar facts, and that it might not be applicable to all cases. In the Federal case a memorandum opinion adopts the measure of liability stated in the two Pennsylvania cases as appropriate under the Missouri statute. The three cases depart from the majority rule, supported by the authorities cited and discussed herein, which majority rule is stated in American Jurisprudence as follows:

"When it is claimed that a cotenant in possession of a mine or a mineral property has become liable to his co-tenants for profits accruing from his productive operations, the usual mode of settling the account is to charge him with all his receipts and credit him with all his expenses, thereby ascertaining the net profits available for distribution. In other words, the usual basis of an accounting by a cotenant who works the common mine or develops the common oil and gas property is the value of the product, less the necessary expenses of production." 14 Am. Jur., p. 106, Sec. 38.

The text of American Jurisprudence contains also a statement that the weight of authority and the prevailing rule are that when a co-owner of mineral property works the property and disposes of the minerals produced, he must account to his cotenant for all profits made to the extent of his interest in the property. 14 Am. Jur., p. 104, Sec. 36.

The text of American Jurisprudence is supported by many decisions at the pages cited, and it is supported by the cases hereinabove cited where is discussed the duty of the producing tenant to account to his cotenant. It clearly appears from careful examination of the cases cited in American Jurisprudence, those cited herein and in the briefs of both parties that the measure of accounting used by the trial court and approved by the Court of Civil Appeals accords with the great weight of authority.

■ It is argued by petitioner that his receipts have been from sales of a manufactured product, and that respondents should not be permitted, by sharing in the profits, to obtain the benefits of his personal skill and industry and of the flux oil and water used and the machinery, apparatus and equipment belonging to petitioner. We believe that the preparation of the rock asphalt for market, as described by petitioner's testimony and by that of other witnesses, is a processing rather than a manufacturing. The rock asphalt is rock asphalt in the ground, that is, limestone rock impregnated with asphalt. To make it

ready for the market and for use in the building of roads it is mixed and crushed, and oil is mixed with it to give the small particles of rock a film of oil, and water is put in the mixture so that it will not become solid in transit. It is rock asphalt when it is sold and when it is used on the roads. The producing tenant is required to account to his cotenants for net profits realized from mining, smelting, crushing, processing or marketing solid minerals taken from the land. Silver King Coalition Mining Co. v. Silver King Consol. Mining Co. (8 Cir.) 204 Fed. 166; Am. Cas. 1918B. 571; Newman v. Newman, 27 Gratt (Va.) 714; Cosgriff v. Dewey 21 App. Div. 129, 47 N. Y. S. 255 (affirmed 164 N. Y. 1, 58 N. E. 1, 79 Am. St. Rep. 620.

■ A statement of the expenses claimed by White as incident to the mining and marketing of the rock asphalt was prepared by him, furnished to respondents and introduced in evidence. With a few unimportant exceptions the statement was accepted and used by the jury as showing expenses to be deducted from the gross receipts in determining the net profits. The statement lists as expenses many items and large sums for flux oil, as well as charges for payrolls, salaries, depreciation, repairs, insurance, commissions, etc. In addition to these expenses, the jury, following the trial court's instructions, allowing substantial credits as reasonable compensation for White's personal services and as the reasonable value of the use of the plant and other property belonging to him. Examination of the evidence from which the jury's computation of the amount of net profits was made discloses that the jury was generous in the credits given for the expenses above referred to, and also in the credits for the use of petitioner's plant and other property and for his personal services. The trial court's judgment permits petitioner within six months after the sale by the receiver to remove the buildings, plant, property and equipment owned by him and situated on the premises. It is to be assumed that the jury, which heard petitioner testify as to his experience and business ability, took these into consideration when in computing the net profits it gave credit for the value of his personal services.

The rock asphalt was owned in undivided interests by all of the cotenants. Their ownership extended to all of the rock asphalt and to all of the advantages and peculiar conditions and stages of development of the property at the time when petitioner terminated the lease. This ownership extended to the developed pit with its great wall of easily accessible rock asphalt and to the valuable mining site. It extended to the use value of the rock asphalt and to its profit possibilities. To limit the ac-

counting to the value in place of the rock asphalt mined by petitioner, would be to permit him to use for his own profit the property owned in common and the advantages and opportunities for profit inherent in that ownership and to deprive respondents of a substantial part of its value and benefits. In our opinion, the trial court's judgment, requiring petitioner to account to his co-owners according to their interests for the profits realized from the common property after crediting him with all of the co-owners the benefits and values of their ownership, is correct in principle and, as has been said, is supported by the decided weight of authority.

The judgments of the district court and the Court of Civil Appeals are affirmed.

Opinion delivered October 13, 1948.

Rehearing overruled December 15, 1948.

MR. JUSTICE SIMPSON, with whom JUSTICES SHARP, BREWSTER and FOLLEY concur, dissenting.

It is respectfully submitted that the measure of recovery allowed the respondents by the majority ruling is wrong, and is contrary to the applicable precedents under the established facts. It results in what is earnestly urged to be an unjust exaction of the petitioner White, who should have been required to account for $99,334.53, the value in place of the rock asphalt taken, and not $222,382.72, its net manufactured value.

Petitioner White had spent practically a lifetime in the rock asphalt business. He worked the asphalt deposits on the Smyth ranch from 1923 until 1941 under a contract with the landowners, which he then terminated, as he had the right to do. He had acquired one-ninth interest in the 200-acre tract he was working, as well as one-ninth of the rock asphalt under some 30,000 acres of the Smyth ranch, and continued working the deposits after the contract with his cotenants ended. He notified them what he was doing. He had a complete legal and moral right to be on the land and to mine the rock.

This rock, after mining, has to be manufactured into paving material before it is of any practicable use. It is blasted from its beds in large pieces, which are broken up by further blasting. It is then scooped onto trucks by steam shovels and hauled

to and further pulverized by a crushing machine. It is then taken to a storage bin where the rock with high asphaltic content is placed at one end, that with a low content at the other. This bin is equipped with vibrating feeders which drop the rock in proper portions on a conveyor belt which takes it to other grinders for further processing. After the final crushing, the rock, by means of a screen, is separated into three bins according to the size of the particles into which it has been crushed. Then the rock, sizes kept separate, is weighed, dropped into a mixer known as a "pug mill' and oil is introduced into the prodduct under pressures running from 75 to 100 pounds. Powerful paddles churn the material so the oil is thoroughly fused into it. (During the period he is held to account, petitioner mixed oil valued at $120,616.13 with the $99,334.53 worth of crude rock asphalt he removed from the land.) Suitable quantities of water are added and milled into the product. The resulting mixture is a manufactured paving material which petitioner has been selling under the registered trade name of "Valdemix."

The plant and equipment investment of the petitioner exceeded $500,000.00.

The asphalt business is highly competitive. So competitive in fact that petitioner's Uvalde Mines and Uvalde Asphalt Company are the only survivors among all who have tried. One adequately capitalized concern, for instance, abandoned the business after losing at least $1,000,000.00.

In addition to the manufacturing of crude rock asphalt into a. finished paving product, petitioner employed his skill and experience in selling it. He would agree in advance with contractors bidding on road work that if the contractor should be the successful bidder he would deliver "Valdemix" in given quantities and at certain prices and times. His lifetime of experience in the business enabled him to succeed where others had failed. He knew how to mine, how to manufacture, and how to sell.

What the complaining cotenants are entitled to get is the value of that which was taken, that is, crude rock asphalt. Any higher figure would no longer be compensatory but punitive. And this is the measure of recovery fixed by the authorities. The cases cited by the majority do not decide differently. Neither Kahn v. Central Smelting Co., 102 U. S. 641, 26 L. Ed. 266, nor Silver King Coalition Mining Co. v. Silver King Consol. Mining Co. (8th Cir.) 204 Fed. 166, Am. Cas. 1918B, 571, nor

Grant v. Pilgrim (9th Cir.) 95 Fed. (2d) 562, nor Campbell v. Homer Ore Co., 309 Mich. 693, 16 N. W. (2d) 125, nor Barnum v. Landon, 25 Conn. 137, cited by the majority in support of its ruling, involves any manufacturing and processing such as it presented here. Those cases either directly or impliedly hold that a joint owner of a mining lode may recover of his cotenant who works the lode the value of the ore taken at the mouth of the pit less the reasonable cost of getting it there. And that is the same thing, under the authorities which will be later noticed, as the value of the ore in place, the basis of accounting to which White should justly be held. The majority opinion cites only two cases, cases relied upon heavily in the briefs of respondents, involving manufactured value as a basis of accounting. One is Cosgriff v. Dewey, 21 App. Div. 129, 47 N. Y. S. 255 (affirmed 164 N. Y. 1, 58 N. E. 1, 79 Am. St. Rep. 620), a New York case which does not discuss, cite, nor undertake to apply principles of mining law. In this case, a cotenant who took and crushed rock from the common property was held to account for the net value of the crushed stone. The case turns principally on the point that the defendant was making an unusual and wasteful use of the freehold. The other case is a mining case from Virginia, Newman v. Newman, 27 Gratt. (Va.) 714, where the complainant owned not only one-half of the lands upon which the ore beds were located, *but also one-half of the forge* used to smelt the ore. Certainly a recovery on the basis of net manufactured value was just, since the complainant was joint owner not only of the ore beds but also of the machinery used in smelting. Not so here, where the respondents do not own nor claim to own any interest in the expensive and complicated machinery White employed to manufacture the crude rock asphalt into a finished product suitable for the markets.

The rule in Texas as elsewhere in oil and gas cases is that a cotenant producing oil must account to his co-owners for the value of the crude oil produced less the reasonable cost of producing and marketing. Burnham v. Hardy Oil Co. (Tex. Civ. App.) 147 S. W. 330, affirmed 108 Texas 555, 195 S. W. 1139; 1 Summers, Oil and Gas (2d ed.) sec. 37, p. 97, sec. 38, p. 108. None would say that if a joint owner produced crude oil and then refined it, his cotenants would be entitled to an accounting on the basis of the value of the refined products. Yet that is the very result the majority has reached here. The raw rock asphalt when first mined is no doubt as little suited for paving as crude oil when first produced is suitable for automobile fuel. Just as it takes refining to prepare crude oil for motor fuel,

so does it take manufacturing and processing, including the addition and blending of other products more valuable than the crude rock asphalt itself, coupled with an experienced skill and knowledge of the business, to ready the raw rock asphalt for paving. The nonmining cotenant is entitled only to the net value of the crude oil in the one case, and certainly to no more than the net value of the crude rock asphalt in the other.

Cases directly in point have arisen in Pennsylvania and Missouri, the latter a federal case. Appeal of Fulmer, 128 Pa. 24, 18 Atl. 493, 15 Am. St. Rep. 622; McGowan v. Bailey, 179 Pa. 470, 36 Atl. 325; Clowser v. Joplin Mining Co., 4 Dill. 469 note, 5 Fed. Cas. No. 2908a. The majority opinion frankly declines to follow them, and cites, as supporting the erroneous conclusion that these cases do not represent the prevailing view, a passage from American Jurisprudence (vol. 14, p. 106). This passage, so quoted with approval in the majority opinion, sums up the proper basis of accounting thus: "In other words, the usual basis of an accounting by a cotenant who works the common mine or develops the common oil and gas property is the value of the product, less the necessary expenses of production." *The Pennsylvania rule as announced in Fulmer's Case* (which the majority will not follow) *is cited by American Jurisprudence in support of, not as an exception to, this rule.* It is clear that this measure of accounting means that the respondents are entitled to the value of their raw rock asphalt in place, or, what is the same thing, its value after severance less the cost of mining and moving.

Writers have stated the rule as follows:

"He is accountable to his cotenants for their share of all that he mines. He must compensate them for the *value in place* of their share of the minerals which he mines and takes. This value is to be measured by the value of ore leave or royalty, that is, of the privilege of removing the mineral, which in turn is to be arrived at by expert opinion. This obligation is enforced in the same manner in the case of mines as in the case of the profits of any other real estate owned jointly." Barringer and Adams, Law of Mines and Mining in the United States, p. 19.

And,

"So in an accounting between tenants in common, the value of ore taken from the land by one tenant is to be estimated according to its value *in place*." 3 Sedgwick, Damages (9th ed.) p. 1936.

A reason for allowing, as in oil and gas cases, an accounting for the value of the solid minerals at the pit mouth less the expense of mining is the difficulty of estimating their value in the ground. The following reasoning is typical:

"Here both parties had an interest in the land, the defendants being one of the tenants in common; and, as is said by Sharswood, J., in Coleman's Appeal, 62 Pa. St. 252: 'A tenant in common exercises his undoubted right to take the common property, and he has no other means of obtaining his own just share than by taking at the same time the shares of his companions. The value of the ore in place is, therefore, the only just basis of account.' But as, in the case before him, no evidence had been given as to the value of the ore in place, the finding of the master was that the value of the ore at the mine's mouth, after deducting the expenses of putting it there, was an equitable basis on which to state the account.

"The master in this case determined that plaintiff was entitled to one-third the value of the coal *in place,* and in this conclusion we concur." McGowan v. Bailey, 179 Pa. 470, 479, 36 Atl. 325, 326. (Emphasis supplied.)

Again the same rule is stated:

"And if evidence is not obtainable of the value of the minerals in situ, or if the circumstances of the case make it impractical to fix their value in this manner, the same result is generally arrived at by proving their value at the mouth of the pit, and deducting therefrom the expense of mining and transporting them to that place." Note, 7 A. L. R. 908.

So, the virtually uncontradicted rule of decision as well as the better reasoning requires an accounting here on the basis of the value of the crude rock asphalt in place or, what is the same thing, its value before being processed at White's mill less the reasonable cost of getting it there.

In Texas this is the rule of accounting as to innocent trespassers in conversion cases. Shall White, who was certainly no trespasser, be held under a more onerous duty to account than a trespasser who is guilty, though innocently, of conversion? The rule in this State was stated as far back as 1910 in Bender v. Brooks, 103 Texas 329, 335, 127 S. W. 168, 170, Am. Cas. 1913A, 559: "The rule applicable to such facts is stated thus: 'It is the prevailing rule that in an action for unlawfully working a mine and extracting coal or ore therefrom, if the taking was not a willful trespass, but was the result of an honest mis-

take as to the true ownership of the mine, *the measure of damages is the value of the coal or ore as it was in the mine before it was disturbed.* The recovery in such case is limited first by the value of what is taken, and second by the cost of mining, extraction, and hoisting to the surface or delivering at the pit's mouth.'" (Emphasis supplied.)

The duty of a cotenant to account on the basis of the value of the mineral in place is the clear and necessary effect of the holding in Kirby Lumber Co. v. Temple Lumber Co., 125 Texas 284, 83 S. W. (2d) 638. There, after a full consideration of the authorities, it was concluded that a cotenant must account for timber innocently cut in excess of his share upon the basis of its value in place, called in that case "stumpage value." The majority seeks to distinguish the case upon the ground that the plaintiff there had sued, not for profits, but for gross manufacured value. This attempted distinction is, I submit, obviously irrelevant. What happened was that this court in that case gave clear sanction to the principle that the cotenant should account for the value of what he took, that is, the value of the timber in place. That was the very judgment rendered by this court. The cause was not remanded for a determination of what profits the cotenant had made. This for the obvious reason that the *net manufactured value* of the timber was not the measure of recovery. The majority here states that in the Kirby-Temple case the timber was "of uniform value and could readily be partitioned in kind." That situation resulted in the court's crediting Temple Lumber Company with the two-thirds of the timber which it owned, but requiring it to account to its co-owner on the basis of the *value in place* of the timber it cut over its own two-thirds. Here the majority holds that since the asphalt in place was not partible in kind, White must account even if he did take less than his one-ninth portion. This is right. But the opinion then proceeds to apply an improper measure of accounting, a measure necessarily in conflict with the Kirby-Temple case and contrary to the value when produced less the cost of producing measure laid down in the oil and gas cases. I earnestly insist that this is wrong.

The following quotation from the Kirby-Temple opinion clearly demonstrates how much the majority is at variance with the holding in that case:

"We are inclined to the view that where one cotenant merely cuts and appropriates more than his share of the standing timber on land owned jointly by himself and others, he cannot be

charged by the other joint owners with the manufactured value of such excess timber, for in cutting the timber he makes no unusual use of the real estate of which he is a tenant in fee, and he cannot be classed as a trespasser. (Citing cases.) In such a case the remedy of the cotenant not cutting the timber against the cotenant cutting more than his share is for the value of the excess of such timber in its original form." 125 Texas 284, 297, 83 S. W. (2d) 638, 645.

The result in the Kirby-Temple case is fair and just. It awards full compensation to co-owners whose property is taken, but refuses to allow a punitive recovery. In the case at bar just such a recovery is adjudged against petitioner, who has violated no law, has (the jury so found) taken even less than his fair share of the minerals, and has openly and in the exercise of a clear legal and moral right worked asphalt pits on his own land.

The respondents ought not to be allowed to share in the capital investment, the experience, enterprise and personal business acumen of the petitioner. To allow this sharing puts a grim penalty upon freedom of enterprise and the risk of one's own capital in a highly hazardous and competitive business. The respondents can be made whole by awarding them the value of their share in place of the crude rock asphalt which was mined. This is fair and just. It allows full compensation for what was taken. Respondents are entitled to this, but certainly not to more.

Opinion delivered October 13, 1948.